2006 ND 254

**Arnold AGA, Claimant and Appellant**

v.

**WORFORCE SAFETY AND INSURANCE, Appellee**

and

**Barlow's Miracle Mart, Inc., Respondent.**

No. 20060185.

Supreme Court of North Dakota.

Dec. 13, 2006.

Stephen D. Little, Dietz & Little Lawyers, Bismarck, ND, for claimant and appellant.

Lawrence A. Dopson, Special Assistant Attorney General, Bismarck, ND, for appellee.

MARING, Justice.

[¶ 1] Arnold Aga appeals from a district court judgment affirming a Workforce Safety and Insurance ("WSI") order denying his reapplication for disability benefits. We conclude WSI's finding that Aga had not sustained a significant change in his compensable medical condition is supported by a preponderance of the evidence, and we affirm.

I

[¶ 2] Aga suffered a work-related injury to his lower back in 1999, while employed as a bakery manager at Miracle Mart in Minot. WSI accepted Aga's claim for benefits and paid him associated medical and disability benefits. Aga received treatment for his back from a chiropractor, Dr. Paul Ellenbecker. Aga thereafter began experiencing hip and knee pain related to his work injury, and a January 2003, functional capacity evaluation stated Aga was able to work at a "medium" level. Aga ultimately had a right hip replacement by Dr. Dwight Woiteshek in July 2003. Dr. Woiteshek released Aga to return to full-time work with no restrictions, and Aga returned to full-time work at Miracle Mart on November 17, 2003.

[¶ 3] According to Aga, his condition worsened in January 2004. On January 7, 2004, Dr. Ellenbecker reported that Aga had indicated some hip and right low back pain. On February 25, 2004, Dr. Ellenbecker indicated that Aga had reported mild low back pain, pain in the right butt cheek, and a sore right hip. On March 2, 2004, Dr. Ellenbecker noted that Aga had reported immediate and constant low back pain after lifting a fifteen pound package. On March 17, 2004, Dr. Ellenbecker re-

ported that Aga had indicated another episode of low back pain that has been gradually getting worse and his right hip felt like it was going to pop out of its socket. On March 22, 2004, Dr. Woiteshek reported Aga was experiencing "more and more trouble with his right hip," and a bone scan showed an inflammation of his right hip. On May 18, 2004, Dr. Ellenbecker noted that Aga had reported both sides of his low back were hurting and had been bothering him for a couple of weeks.

[¶ 4] On June 2, 2004, Dr. Ellenbecker asked WSI for approval of a functional capacity evaluation to determine Aga's work limitations, stating it was possible some of his residual hip and low back pain were secondary to his return to work as a baker. On June 11, 2004, Dr. Ellenbecker noted that Aga reported his right hip felt "loose" and he had intermittent low back pain. On July 1, 2004, Dr. Ellenbecker noted that Aga reported constant low back pain for the past three to four days. On July 12, 2004, Aga wrote to WSI, inquiring about the status of the requested functional capacity evaluation and seeking authorization to see another doctor about the pain in his hip. On July 19, 2004, WSI denied Aga's request for a functional capacity evaluation and told Aga to get a referral from Dr. Woiteshek to see another physician for his hip. On July 21, 2004, Dr. Ellenbecker noted that Aga reported he had not been feeling badly since has last treatment.

[¶ 5] On July 29, 2004, Dr. Ellenbecker wrote WSI, asking for a permanent partial impairment rating for Aga:

Mr. Aga continues experiencing right hip dysfunction, which has worsened beginning with his return to full-time work activities on November 17, 2003. The right hip pain has progressively worsened over the past several months, where the patient is exhibiting limited

flexion of the hip, as well as internal hip pain and referral pain down the anterior thigh. A follow up evaluation by his surgeon, Dr. Dwight Woiteshek in March/April 2004 seemed to indicate this was normal, even though it is worse than following surgery and that he would have to live with it.

This pattern does not seem common following hip surgery, as other patients who have had hip replacement surgery do not have these findings. Therefore, I would like to get a second opinion evaluation by orthopedic surgeon Dr. Ernie Godfread in Bismarck. I feel this is necessary before a permanent partial impairment rating is scheduled.

[¶ 6] On August 3, 2004, without obtaining a work restriction from either of his doctors, Aga quit his job at Miracle Mart, effective August 8, 2004, informing his employer:

I can't keep working for you because the job is to [sic] hard on my back and hip. I have talked this over with Dr. Ellenbecker and we agree that I would be better off with a less physical job. We had tried to get Workers Comp. to agree to a Functional Capacity Test so I would know what my limitations were, but they wouldn't let me have one. Without that test, I can't keep working at Miracle Mart because I feel the job makes my condition worse.

[¶ 7] In September 2004, Aga reapplied for disability benefits, checking a box on the reapplication form which indicated he "quit" work, rather than that he was "unable to work." In October 2004, WSI denied Aga's reapplication, finding he was not eligible for disability benefits because he had voluntarily limited his income by resigning from his job at Miracle Mart. Aga requested reconsideration. In December 2004, WSI denied Aga's reapplication, finding he had not sustained a signifi-

cant change in his medical condition and he had not suffered an actual wage loss because he voluntarily quit his job. Aga requested a formal hearing. In March 2005, Aga underwent a second functional capacity evaluation which indicated he could perform sedentary full-time work.

[¶ 8] At a September 2005, formal hearing, neither Dr. Ellenbecker nor Dr. Woiteshek testified. Rather, Aga introduced August 2005, letters to his attorney from Dr. Ellenbecker and Dr. Woiteshek. Dr. Ellenbecker's letter responded to questions from Aga's attorney and provided:

Is it more likely than not that he is disabled as a baker and has been since August 8, 2004? Yes.

Do you believe that the March 10–11, 2005, FCE is an accurate indicator of Mr. Aga's functional capacity? Yes.

If so, is it more likely than not that his functional capacity on August 8, 2004 was substantially similar to that indicated in his 2005 FCE? Yes.

Finally, do Dr. Woiteshek's November 17, 2003, work release and Mr. Aga's March 10–11, 2005, FCE represent a significant change in his medical condition? Yes.

Dr. Woiteshek's letter provided:

It is likely that the patient is disabled as a baker and has been disabled since August 8, 2004. His diagnosis is status post right total hip.

I felt that the functional capacity examination done on March 10–11, 2005 is a very accurate description of his functional capacity and I felt that his functional capacity on August 8, 2004 was similar to that indicated on the FCE of 2005.

I feel my work release on November 17, 2003 and Mr. Aga's March 10–11, 2005 FCE were basically the same in his medical condition.

My logic here is he tried going back to work in November 2003 and he had a failure to do this and his condition was the same.

[¶ 9] An administrative law judge ("ALJ") recommended denying Aga's reapplication for disability benefits, finding he had not sustained a significant change in his compensable medical condition either at the time he quit his job in August 2004, or as he claimed in January 2004, and he had not sustained an actual wage loss caused by a significant change in his medical condition because he voluntarily limited his income by quitting his job. The ALJ specifically rejected the opinions in the letters from Dr. Ellenbecker and Dr. Woiteshek:

Dr. Ellenbecker's opinion is not entirely supported by the medical records and is contradicted by the fact that he failed to provide Mr. Aga with any restrictions or remove him from work in August 2004. He did before, in April 2003. And why do his medical notes indicate that Mr. Aga's condition was stable, consistent, and persistent, if he now believes Mr. Aga sustained a significant change in his condition? While Dr. Ellenbecker did, at times, note diminishing function and increased pain in Mr. Aga's right hip, that he did not remove Mr. Aga from work or order restrictions at the time of Mr. Aga's resignation is significant and indicates that Mr. Aga had not sustained such a significant change in his condition to warrant additional restrictions or removal from work.

33. Dr. Woiteshek's opinion regarding whether Mr. Aga sustained a significant change in his compensable condition is confusing. He states that it is likely Mr. Aga is disabled as a baker and has been since August 8, 2004. But, he says, Mr. Aga's functional capacity, as measured by the 2005 FCE, is basically

the same and coincides with his release of Mr. Aga on November 17, 2003. In other words, according to Dr. Woiteshek, Mr. Aga's condition has not changed. It is the same now as it was in 2003.

34. The greater weight of the evidence does not indicate that Mr. Aga sustained a significant change in his compensable medical condition. The medical records do not show a significant change in Mr. Aga's medical condition in January 2004 when Mr. Aga says his condition became worse, or at the time of his resignation from employment at Miracle Mart. He had the same symptoms before and after his hip replacement surgery and his release to work on November 17, 2003. And as Dr. Ellenbecker noted, Mr. Aga's symptoms and objective findings were persistent and consistent. While Dr. Ellenbecker now says that Mr. Aga suffered a significant change in his compensable medical condition, his opinion is not entirely supported by the medical records and he was not called as a witness to explain his opinion in light of the fact that he frequently noted that Mr. Aga's "symptoms persist and remain consistent," his objective findings "remain similar and chronic," and he failed to either order restrictions or remove Mr. Aga from work. If Mr. Aga had sustained a significant change in his medical condition, one would assume that this would be evidenced by some changes in his work restrictions. It is not. At no time after he was released to work on November 17, 2003, was Mr. Aga put on restrictions or removed from work. Instead, Mr. Aga quit his job, even though he was well aware that his doctor could impose restrictions and his employer had accommodated his restrictions in the past. The fact that Dr. Ellenbecker now says that Mr. Aga sustained a significant change in his medical condition

is not persuasive, since whatever change Mr. Aga may have sustained, it was not sufficient to persuade his doctors that he required work restrictions or removal from work.

35. Further, the fact that Mr. Aga was found to be at the sedentary level of work during the FCE completed in March 2005 does not necessarily show that he suffered a significant change in his compensable medical condition in January 2004, or at the time he quit work and reapplied for benefits. While both doctors opine that the 2005 FCE does reflect what Mr. Aga's functional capacity was on August 8, 2004, and that Mr. Aga was totally disabled from working as a baker in August 2004, their opinions were solicited more than a year after Mr. Aga quit his job and for reasons already discussed, they are inconsistent with the medical records and recommendations at that time.

[¶ 10] WSI adopted the ALJ's recommendation and denied Aga's request for further reconsideration. The district court affirmed WSI's decision.

## II

[¶ 11] Courts exercise a limited review in appeals from decisions by an administrative agency. *Victor v. Workforce Safety & Ins.*, 2006 ND 68, ¶ 12, 711 N.W.2d 188. Under N.D.C.C. § 28-32-46, an administrative agency order must be affirmed by a district court unless:

1. The order is not in accordance with the law.
2. The order is in violation of the constitutional rights of the appellant.
3. The provisions of this chapter have not been complied with in the proceedings before the agency.
4. The rules or procedure of the agency have not afforded the appellant a fair hearing.

5. The findings of fact made by the agency are not supported by a preponderance of the evidence.
6. The conclusions of law and order of the agency are not supported by its findings of fact.
7. The findings of fact made by the agency do not sufficiently address the evidence presented to the agency by the appellant.
8. The conclusions of law and order of the agency do not sufficiently explain the agency's rationale for not adopting any contrary recommendations by a hearing officer or an administrative law judge.

[¶ 12] In an appeal from a district court's decision on an administrative appeal, we review the agency order in the same manner. N.D.C.C. § 28-32-49; *Victor*, 2006 ND 68, ¶ 12, 711 N.W.2d 188. WSI is responsible for weighing the credibility of witnesses and resolving conflicts in the evidence. *Tverberg v. Workforce Safety & Ins.*, 2006 ND 229, ¶ 8, 723 N.W.2d 676. In assessing an administrative agency's findings of fact, we do not "make independent findings of fact or substitute our judgment for that of the agency. We determine only whether a reasoning mind reasonably could have determined that the factual conclusions reached were proved by the weight of the evidence from the entire record." *Power Fuels, Inc. v. Elkin*, 283 N.W.2d 214, 220 (N.D.1979).

## III

[¶ 13] A claimant seeking workers compensation benefits has the burden of proving by a preponderance of the evidence that he is entitled to benefits. N.D.C.C. § 65-01-11; *Beckler v. Workforce Safety & Ins.*, 2005 ND 33, ¶ 9, 692 N.W.2d 483; *Bachmeier v. North Dakota Workers Comp. Bureau*, 2003 ND 63, ¶ 11,

660 N.W.2d 217; *Lesmeister v. North Dakota Workers Comp. Bureau*, 2003 ND 60, ¶ 22, 659 N.W.2d 350; *Gronfur v. North Dakota Workers Comp. Fund*, 2003 ND 42, ¶ 6, 658 N.W.2d 337. When a claimant's disability benefits have been discontinued and he subsequently sustains a significant change in his medical condition that causes further wage loss, the claimant may reapply for disability benefits under N.D.C.C. § 65–05–08(1), which provides:

> When disability benefits are discontinued, the organization may not begin payment again unless the injured employee files a reapplication for disability benefits on a form supplied by the organization. In case of reapplication, the award may commence no more than thirty days before the date of reapplication. Disability benefits must be reinstated upon proof by the injured employee that:
>
> a. The employee has sustained a significant change in the compensable medical condition;
>
> b. The employee has sustained an actual wage loss caused by the significant change in the compensable medical condition; and
>
> c. The employee has not retired or voluntarily withdrawn from the job market as defined in section 65–05–09.3.

Claimants reapplying for disability benefits under N.D.C.C. § 65–05–08(1) have the burden of showing both a significant change in their compensable medical condition and an actual wage loss caused by the significant change in their medical condition. *Beckler*, at ¶ 9; *Bachmeier*, at ¶ 11; *Lesmeister*, at ¶ 22; *Gronfur*, at ¶¶ 6, 11.

■ [¶ 14] Aga argues he demonstrated a significant change in his medical condition and an actual wage loss. He argues the ALJ and WSI misconstrued the medical evidence because they relied on the medical records of Aga's son in determining Aga's condition had improved in February 2005. Aga also claims the ALJ based her recommended decision on his failure to call his treating chiropractor, Dr. Ellenbecker, as a witness. He argues injured workers typically rely upon written medical opinions by their treating physicians, which are based upon objective medical evidence. He argues N.D.C.C. §§ 65–05–08 and 65–05–08.1 do not require doctor certification of a disability before an injured employee quits his job, or before he files a reapplication for disability benefits. He argues WSI's determinations that he did not sustain a significant change in his medical condition and have an actual wage loss are not supported by the greater weight of the evidence.

[¶ 15] This record reflects that Aga saw Dr. Ellenbecker on February 16, 2005, and Aga's son also saw Dr. Ellenbecker for low back treatment on February 16, 21, and 25. WSI's record for Aga's claim includes two pages of Aga's son's medical records from Dr. Ellenbecker for treatment in February 2005. The ALJ's findings include a chronological recitation of Aga's medical records from December 1999, through the March 2005, functional capacity evaluation, including a recitation in one finding of fact from Aga's son's February 2005 medical records for treatment by Dr. Ellenbecker. Aga's son's medical records were a small part of the ALJ's recitation of the medical evidence and were for a period of time six months after Aga's last day of work at Miracle Mart in August 2004.

■ [¶ 16] Although Aga's son's medical records with Dr. Ellenbecker were apparently inadvertently included in the record before WSI and were mentioned by the ALJ in her recommended decision, Aga's son's records involved treatment six months after Aga quit work and the ALJ's

decision reflects those records were not determinative of Aga's claim. Rather, the ALJ's findings effectively rejected Aga's doctors' opinions that Aga had sustained a significant change in his compensable medical condition when he quit work. Aga's contemporaneous medical records suggest Aga may have reported some difficulty at work to his doctors, however, neither of his doctors restricted his work in July or August 2004. This record reflects Aga's doctors had previously placed him on work restrictions, and Aga admits he was represented by counsel during the time period when he quit work. The record also reflects that Aga's employer informed WSI the employer had not had any contemporaneous complaints or concerns brought to its attention by Aga. There was also evidence that after Aga left employment at Miracle Mart, he reported working around a farm and hauling hay bales, but could only do this activity for about four hours. Aga presented written after-the-fact responses by his doctors to his attorney in August 2005, which indicated the doctors believed it was likely Aga had been disabled since August 8, 2004. However, the ALJ explained Aga was not contemporaneously restricted by his doctors in his work activities in August 2004. *See* N.D.C.C. § 65–05–08.1 (employee's doctor shall certify period of disability). A claimant's change in compensable medical condition must be contemporaneous with and tied to an alleged actual loss of wages. *Beckler,* 2005 ND 33, ¶ 12, 692 N.W.2d 483.

[¶ 17] Although Aga asserts claimants typically use doctor's letters to support their claim, WSI is responsible for weighing the credibility of medical evidence. *Elshaug v. Workforce Safety & Ins.,* 2003 ND 177, ¶ 13, 671 N.W.2d 784. In the absence of a proper objection, an administrative agency may receive documentary evidence in some instances. *See*

N.D.C.C. § 28–32–24. Aga was entitled to subpoena his doctors or to present telephonic testimony from his doctors. *See* N.D.C.C. §§ 28–32–33 and 28–32–35. Aga nevertheless relied on written opinions from his doctors without any further elaboration and did not present testimony from his doctors or other employees at Miracle Mart to support his claim. It is well-established that in a reapplication for disability benefits, a claimant has the ultimate burden of proof to establish a significant change in his compensable medical condition and is responsible for making a record to support his claim. *Beckler,* 2005 ND 33, ¶ 9, 692 N.W.2d 483; *Bachmeier,* 2003 ND 63, ¶ 11, 660 N.W.2d 217; *Lesmeister,* 2003 ND 60, ¶ 22, 659 N.W.2d 350; *Gronfur,* 2003 ND 42, ¶¶ 6, 11, 658 N.W.2d 337. On this record and under our deferential standard of review, we conclude a reasoning mind could reasonably conclude that Aga failed to establish he sustained a significant change in his compensable medical condition when he reapplied for disability benefits. We therefore conclude WSI's denial of Aga's reapplication for benefits is supported by a preponderance of the evidence.

### IV

[¶ 18] We affirm the judgment affirming WSI's order.

[¶ 19] GERALD W. VANDE WALLE, C.J., DANIEL J. CROTHERS, DALE V. SANDSTROM, and CAROL RONNING KAPSNER, JJ., concur.