2008 ND 47

**Gaylen HUWE, Claimant and Appellant**

v.

**WORKFORCE SAFETY AND INSURANCE, Appellee**

and

**G.L. Trucking & Rental, Respondent.**

**No. 20070067.**

Supreme Court of North Dakota.

March 20, 2008.

Kevin J. Chapman, Chapman Law Office, Williston, N.D., for claimant and appellant.

Lawrence E. King, Special Assistant Attorney General, Bismarck, N.D., for appellee.

VANDE WALLE, Chief Justice.

[¶ 1] Gaylen Huwe appeals from a district court judgment affirming an order of Workforce Safety and Insurance ("WSI") denying his reapplication for disability benefits. We reverse and remand to WSI for further consideration.

I

[¶ 2] Huwe suffered a serious work-related injury to his head, neck, back, jaw, and teeth while employed as a truck driver in December 1992. WSI accepted his claim and paid medical and disability benefits. In January 1995, Huwe accepted a position with the State of North Dakota as a motor carrier inspector, and his disability benefits were terminated.

[¶ 3] Huwe contends that he began experiencing increased headaches and back and neck pain in 2003. In September 2003, Huwe had back surgery to fuse discs at the C4–C7 levels. There is conflicting evidence in the record regarding the relative success of this surgery. Huwe contends he continued to suffer debilitating pain and migraine headaches after the surgery, as evidenced by his frequent doctor and emergency room visits after the surgery. Contemporaneous medical records indicate Huwe reported in November 2003, two months after the surgery, that he was doing "very well" and the headaches were "completely gone," but that he continued to suffer "some vague neck pain." At his three month follow-up visit in December 2003, Huwe stated he was "feeling better" and had returned to work, and he was advised he could return to his "normal daily activities."

[¶ 4] In February 2004, Huwe entered a residential treatment program for alcoholism and substance abuse. Huwe never returned to his job with the State after that date. Huwe eventually tendered his resignation from his position with the State effective July 31, 2004, contending he was no longer physically capable of performing the duties of the job.

[¶ 5] While still in treatment for alcoholism and substance abuse, Huwe reapplied for disability benefits on June 9, 2004, alleging that his medical condition had significantly worsened in September 2003 and he was no longer able to work as a motor carrier inspector. WSI denied Huwe's reapplication, noting that the medical evidence did not indicate Huwe had sustained a significant change in his compensable medical condition, that the medical records indicated he was physically able to return to work in light to medium positions, and that Huwe had been taken off work by his doctors because of addiction and medical conditions unrelated to the work injury.

[¶ 6] Huwe requested a formal hearing before an administrative law judge ("ALJ"). The ALJ issued recommended

findings of fact, conclusions of law, and order, finding that Huwe had not sustained a significant change in his compensable medical condition at the time of reapplication for disability benefits and had not sustained an actual wage loss attributable to a significant change in his medical condition. WSI adopted the findings, conclusions, and order of the ALJ as its final order and denied Huwe's reapplication for disability benefits.

[¶ 7] Huwe appealed to the district court, which affirmed WSI's order. Huwe has appealed from the district court judgment affirming WSI's order, contending the greater weight of the evidence proved he had sustained a significant change in his compensable medical condition and had shown an actual wage loss attributable to the change in his medical condition.

## II

[¶ 8] Courts exercise only a limited review in appeals from administrative agency decisions under the Administrative Agencies Practice Act, N.D.C.C. ch. 28–32. *Fettig v. Workforce Safety & Ins.*, 2007 ND 23, ¶ 9, 728 N.W.2d 301; *Tverberg v. Workforce Safety & Ins.*, 2006 ND 229, ¶ 7, 723 N.W.2d 676. Under N.D.C.C. § 28–32–46, the district court must affirm an administrative agency order unless:

1. The order is not in accordance with the law.
2. The order is in violation of the constitutional rights of the appellant.
3. The provisions of this chapter have not been complied with in the proceedings before the agency.
4. The rules or procedure of the agency have not afforded the appellant a fair hearing.
5. The findings of fact made by the agency are not supported by a preponderance of the evidence.

6. The conclusions of law and order of the agency are not supported by its findings of fact.
7. The findings of fact made by the agency do not sufficiently address the evidence presented to the agency by the appellant.
8. The conclusions of law and order of the agency do not sufficiently explain the agency's rationale for not adopting any contrary recommendations by a hearing officer or an administrative law judge.

[¶ 9] On appeal from the district court's decision in an administrative appeal, we review the agency order in the same manner. *Tverberg*, 2006 ND 229, ¶ 8, 723 N.W.2d 676. We exercise restraint in deciding whether the agency's findings of fact are supported by a preponderance of the evidence, and we do not make independent findings or substitute our judgment for that of the agency. *Fettig*, 2007 ND 23, ¶ 10, 728 N.W.2d 301; *Tverberg*, at ¶ 8. In reviewing an agency's findings of fact, we determine only whether a reasoning mind reasonably could have determined that the factual conclusions reached were proved by the weight of the evidence from the entire record. *Power Fuels, Inc. v. Elkin*, 283 N.W.2d 214, 220 (N.D.1979); *Fettig*, at ¶ 10; *Tverberg*, at ¶ 8. However, an agency's decision on questions of law are fully reviewable. *Opp v. Ward County Social Services Bd.*, 2002 ND 45, ¶ 8, 640 N.W.2d 704.

[¶ 10] WSI has the responsibility to weigh the credibility of medical evidence and resolve conflicting medical opinions. *Thompson v. Workforce Safety & Ins.*, 2006 ND 69, ¶ 11, 712 N.W.2d 309; *Barnes v. Workforce Safety & Ins.*, 2003 ND 141, ¶ 20, 668 N.W.2d 290; *Negaard–Cooley v. North Dakota Workers Comp. Bureau*, 2000 ND 122, ¶ 18, 611 N.W.2d 898. When confronted with a classic "bat-

tle of the experts," a fact-finder may rely upon either party's expert witness. *Elshaug v. Workforce Safety & Ins.*, 2003 ND 177, ¶ 11, 671 N.W.2d 784. Although WSI may resolve conflicts between medical opinions, the authority to reject medical evidence selectively does not permit WSI to pick and choose in an unreasoned manner. *Id.; Negaard–Cooley*, at ¶ 19. WSI must consider the entire record, clarify inconsistencies, and adequately explain its reasons for disregarding medical evidence favorable to the claimant. *Barnes*, at ¶ 20; *Negaard–Cooley*, at ¶ 18.

## III

[¶ 11] A claimant seeking benefits from the workers compensation fund has the burden of proving by a preponderance of the evidence that he is entitled to benefits. N.D.C.C. § 65–01–11; *Aga v. Workforce Safety & Ins.*, 2006 ND 254, ¶ 13, 725 N.W.2d 204; *Bachmeier v. North Dakota Workers Comp. Bureau*, 2003 ND 63, ¶ 11, 660 N.W.2d 217. When a claimant's disability benefits have been discontinued and the claimant subsequently sustains a significant change in medical condition that causes an additional wage loss, the claimant may file a reapplication seeking further disability benefits. *Aga*, at ¶ 13; *Bachmeier*, at ¶ 11. Reapplication for disability benefits is governed by N.D.C.C. § 65–05–08(1):

> When disability benefits are discontinued, the organization may not begin payment again unless the injured employee files a reapplication for disability benefits on a form supplied by the organization. In case of reapplication, the award may commence no more than thirty days before the date of reapplication. Disability benefits must be reinstated upon proof by the injured employee that:

a. The employee has sustained a significant change in the compensable medical condition;

b. The employee has sustained an actual wage loss caused by the significant change in the compensable medical condition; and

c. The employee has not retired or voluntarily withdrawn from the job market as defined in section 65–05–09.3.

A claimant reapplying for disability benefits under N.D.C.C. § 65–05–08(1) bears the burden of showing a significant change in his compensable medical condition and an actual wage loss caused by the significant change in his compensable medical condition. *Aga*, at ¶ 13; *Sorlie v. Workforce Safety & Ins.*, 2005 ND 83, ¶ 15, 695 N.W.2d 453.

## IV

[¶ 12] The parties agree that this is a complex case with "voluminous" medical records. Huwe has psychological and addiction problems, some predating his work injury in 1992, that factor into his current disability status. Huwe has not argued that his psychological and addiction problems stem from his work injury, and has disavowed any reliance upon these psychological components. Rather, Huwe argues that there is "overwhelming" medical proof that he suffered a significant change in his physical medical condition warranting reinstatement of disability benefits under N.D.C.C. § 65–05–08(1).

[¶ 13] In support of its conclusion that Huwe failed to prove he had suffered a significant change in his compensable medical condition or an actual wage loss attributable to the change, WSI relies primarily upon the testimony of Dr. Cooper, WSI's medical director. Dr. Cooper testified at the administrative hearing that, in his opinion, Huwe had not suffered a signifi-

cant change in his compensable medical condition and any inability to work was caused by other non-work related factors. Dr. Cooper described some of Huwe's preexisting conditions that were unrelated to the 1992 work injury:

> Q.  Okay. Can you describe to me your understanding of—of the—what I'll generally categorize as nonwork-related conditions, and can you describe those for me?
>
> A.  Yes. Those conditions consist of alcohol dependence, tobacco use disorder, anxiety, depression, and migraine headaches, and a chemical dependency.
>
> Q.  And can you tell from your review of the records how long those conditions have been in existence?
>
> A.  There is evidence of it going back for 20 years when Mr. Huwe was treated at Fort Meade VA for chem—for chemical dependency.
>
> Q.  Let me—let me—before I finish that, let me ask you: What is his current diagnosis?
>
> A.  The current diagnosis is chronic pain syndrome and anxiety, depression, migraine headaches.  There's also a history of coronary artery disease, hypertension, high cholesterol, and there is a past history of peripheral vascular disease.

When asked whether the 1992 work injury caused Huwe's chronic pain syndrome, Dr. Cooper responded:

> [T]he cause of the current chronic pain syndrome or pain disorder is not the work injury.  It is due to the preexisting factors which allowed the—for the development of chronic pain.

[¶ 14]  Dr. Cooper was expressly asked whether Huwe had suffered a significant change in his compensable medical condition:

> Q.  Okay. Let me talk about Mr. Huwe's reapplication and—and his assertion that he's had a significant change in his medical condition since on or around September of 2003 with the cervical fusion.
>
> Looking at his medical records from that date forward, do you see a significant change in his underlying medical condition?
>
> A.  No, apart from the fact that he had had the surgery.
>
> Q.  Okay.
>
> A.  There was no other change in his condition.
>
> Q.  Okay. Um—
>
> A.  I'm sorry.
>
> Q.  And, in deed, if—if after that it appeared initially to—well, no, let me—let me just ask it this way:  Is there any objective medical evidence to establish a significant change in Mr. Huwe's medical condition after that surgery, except for the fact that there was a surgery, which I obviously understand?
>
> A.  There was no objective evidence for any change in his condition.

[¶ 15]  Dr. Cooper also testified that Huwe's hospitalization in February 2004, the last time he worked, was unrelated to his work injury and was caused by depression and alcohol and substance dependence.  When asked his opinion of Huwe's ability to perform work, Dr. Cooper testified:

> Though Mr. Huwe had been working in the fall of 2003 and then there were a series of events where he was having significant psychosocial difficulties, and then following those events, including, from my understanding, a condition called bacterial endocarditis, he did not return to work.  So his condition in July 2004 may have been different from the condition in the fall of 2003 inasmuch as

he may not have been physically capable of doing that work, but the reason for that was because of these other nonwork-related conditions supervening.

BY MR. KING:

Q. And those other nonwork-related conditions were which, again?

A. The alcohol, the depression. The bacterial endocarditis may have also played a part in the deconditioning process so that his overall condition had declined to the point where he was weak and he'd lost range of motion in his extremities, but that would not have been due to his work injury in nineteen ninety—1992. That would have been due to these other factors taking ahold of him and—and significantly changing his overall condition.

[¶ 16] Huwe contends that Dr. Cooper's medical opinion is outweighed by other "overwhelming" medical evidence in the record. Huwe relies most prominently on the opinion of Dr. Zhang, who first examined Huwe on June 8, 2004. Huwe alleged Dr. Zhang advised him at that time he should not go back to work. Huwe filed his reapplication for disability benefits the next day, June 9, 2004, in reliance upon Dr. Zhang's opinion.

[¶ 17] Although WSI acknowledges that Dr. Zhang believed Huwe was not able to return to work at that time, WSI argues that Dr. Zhang's opinion was not based upon a significant change in Huwe's compensable medical condition. Dr. Zhang's notes from the June 8, 2004, examination indicate he was recommending Huwe remain off work until he had completed addiction treatment and a pain management program. Dr. Zhang did not indicate his recommendation was based upon any change in Huwe's compensable medical condition.

[¶ 18] In written responses, dated July 2, 2004, to questions from a WSI claims analyst, Dr. Zhang further clarified that Huwe's chronic pain was psychologically based, Huwe was physically able to perform light to medium duty work, and there were no objective medical findings to qualify Huwe's being off work:

Question # 1: What is Mr. Huwe's current diagnosis?

Answer: The current diagnoses are:

1. Chronic pain syndrome.
2. Substance abuse including alcohol and narcotic.
3. History of C4–7 spinal fusion failed to improve symptom.
4. Osteoarthritis of both hands.

Question # 2: What is the etiology of his current pain complaint in his neck and lower back? Please explain.

Answer: The etiology for all those years of pain complaint of the neck and back is mostly psychological. This is a chronic pain condition which has been going on for many years and the history of failed repeated physical treatment including a very targeted injection and even surgery have failed to improve his pain condition and his pain behavior and ongoing substance abuse including alcohol and narcotic further prove that this pain condition is mostly a mental condition.

Question # 3: Mr. Huwe has a light-duty-job release. Does this correspond with his current employment? Please explain.

Answer: I think Mr. Huwe physically is fully capable of doing light-duty job at least, even medium duty is no problem for his physical, but his mental condition may limit his ability due to his willingness and substance abuse behavior. At this time, I do not have his current employment description or any information regarding his current employment so I cannot have any comment on this part.

Question # 4: Mr. Huwe has been taken off work. What are the objective medical findings that are disabling him from his current employment?

Answer: No, there is no objective medical finding to qualify him being off work. The only condition which persuaded doctors to give him off work is his pain complaint and behavior as I understand.

[¶ 19] Huwe relies upon the opinions of Dr. Olson and Dr. Lwin to support his contention he was physically unable to perform his job as a motor carrier inspector. In support of this contention, Huwe draws our attention to Dr. Olson's and Dr. Lwin's written responses to questions from Huwe's attorney in May 2005. Each doctor was asked, on the basis of the results of a functional capacities examination performed after Huwe had reapplied for benefits, whether Huwe was capable of performing his job as a motor carrier inspector. Dr. Olson responded "no—safety issues" and Dr. Lwin responded "No." Neither doctor was asked to clarify or expound upon their cursory answers, and there was no attempt to tie their responses to a change in Huwe's compensable medical condition.

[¶ 20] The ALJ, and subsequently WSI, concluded that Huwe had failed to carry his burden of proving a significant change in his compensable medical condition and a resulting actual wage loss. In so doing, the ALJ and WSI explained and resolved the conflicting medical opinions:

7. The preponderance (greater weight) of the evidence indicates that Gaylen Huwe did not sustain a significant change in his compensable medical condition at the time of his reapplication for disability benefits on June 11, 2004. The medical records are consistent with Huwe's testimony that his pain increased as the physical demands of his job increased after September 11, 2001, and that his resumption of drinking is associated with the increased job demands. The records shed little light, however, on the relationship between the many different factors that contributed to Huwe's increased pain symptoms and his compensable medical condition or conditions. Huwe had osteoarthritis in his hands and other areas. His pneumonia and bacterial endocarditis could have affected his overall stamina. He had other heart-related problems. The radiological studies in evidence and the physical examinations by specialists document reported pain levels not commensurate with the objective medical findings. Records from the Fargo VA suggest that other non-work-related accidents from many years ago may have been a factor. Posttraumatic stress disorder may even be a factor. Many of the medical records suggest a strong psychological component to Huwe's chronic pain, long before his job became more physically demanding. That psychological component may well have been caused at least in part by his severe work-related injury but the record does not adequately address that possibility. Finally, neither Dr. Olson's nor Dr. Lwin's responses in May 2005 address the issue of a substantial change in Huwe's compensable medical condition.

8. The preponderance (greater weight) of the evidence indicates that Gaylen Huwe did not sustain an actual wage loss. Huwe concedes he was still employed when he filed his reapplication but argues Dr. Zhang took him off work at that time. Dr. Zhang did not take Huwe off work because of any significant change in the compensable medical condition but because he thought Huwe needed to complete his residential alco-

hol treatment program and a chronic pain management program first. Dr. Zhang had no knowledge of the physical demands of Huwe's job but he believed Huwe had a "disability mentality" that made any work problematic. Huwe asserts that he nevertheless did sustain an actual wage loss after July 31, 2004, because he resigned only when he believed his pain would prevent him from ever doing his job, a belief he validated by the August 2004 FCE and the responses of Dr. Olson and Dr. Lwin.

. . . .

A doctor's opinion can, under limited circumstances, constitute objective medical evidence. But all medical evidence, even physician opinions, must be examined and credibility must be assessed in the process of weighing the medical evidence. *See generally, Myhre v. N.D. Workers Compensation Bureau,* 2002 ND 186, ¶¶ 15, 24, 25, 653 N.W.2d 705. In that regard, WSI's arguments concerning the weight to be accorded Dr. Olson's and Dr. Lwin's opinions are more persuasive than Huwe's arguments.

But, the record before us contains extensive medical records from Trinity Community Clinic concerning the pain medications Huwe was receiving for his condition. Although the findings of the ALJ discuss Huwe's pain and depression they do not refer to these records.

[¶ 21] As we observe in ¶ 11, the claimant is required to establish that he suffered a significant change in his compensable medical condition at the time he was employed and earning wages, and that the change in his medical condition caused an actual loss of those wages. *Bachmeier v. N.D. Workers Comp. Bureau,* 2003 ND 63, ¶ 13, 660 N.W.2d 217; *Gronfur v. N.D. Workers Comp. Fund,* 2003 ND 42, ¶¶ 11–12, 658 N.W.2d 337; *see also*

*Lesmeister v. N.D. Workers Comp. Bureau,* 2003 ND 60, ¶ 22, 659 N.W.2d 350; and *Beckler v. Workforce Safety and Ins.,* 2005 ND 33, ¶ 9, 692 N.W.2d 483; N.D.C.C. § 65–05–08(1). The change in medical condition does not need to cause a total loss of wages, but can cause only a partial loss of wages. *Beckler,* at ¶ 10. A claimant must prove by a preponderance of the evidence that the medical condition for which he seeks benefits is causally related to a work injury. *Swenson v. Workforce Safety and Ins.,* 2007 ND 149, ¶ 24, 738 N.W.2d 892. "To establish a causal connection, a claimant must demonstrate that his employment was a substantial contributing factor to the injury, not that [the] employment was the sole cause of the injury." *Id.*

[¶ 22] The record does support that Huwe self-treated with alcohol as found by the ALJ. There was also concern he was addicted to Lorcet and had withdrawal symptoms when he ran out or it was decreased. The ALJ found Huwe was admitted to the emergency room at the hospital in Williston on "numerous" occasions.

[¶ 23] At both the administrative and the district court hearings, Huwe submitted evidence and argued he suffered chronic pain and increased pain as a result of his surgery and the greater physical demands of his job. Dr. Zhang was of the opinion Huwe was suffering from severe chronic pain syndrome, which needed to be treated before he returned to any employment. Huwe's work-related injury does not need to be the sole cause of his medical condition. Further, the employer takes the employee as it finds him. *Bruns v. ND Workers Comp. Bureau,* 1999 ND 116, ¶ 16 n. 2, 595 N.W.2d 298. The fact that Huwe suffered from an addictive personality does not foreclose his recovery of disability benefits. In addition, Dr. Zhang

was of the opinion Huwe had a drug abuse problem and should be in a drug rehabilitation program. The evidence suggests Huwe's narcotic dependency was a result of his medications for his neck and back pain and severe headaches.

[¶ 24] Although Huwe may not have relied on his addiction and psychological problems to support his claim, there is nevertheless considerable evidence in the record to indicate that those problems which stem from and are related to the injury are in great part the reason he is unable to work. If his addiction problems and psychologically based chronic pain syndrome are directly related to Huwe's work injury, they may support an award as a "significant change in the compensable medical condition" under N.D.C.C. § 65–05–08(1). To hold that addiction because of medically prescribed drugs to ease the pain of the work-related injury cannot result in a significant change in the compensable medical condition of the claimant is too narrow a reading of that provision and too narrow a reading of Dr. Zhang's observation that Huwe was physically capable of doing light or medium duty work. If Huwe's body structure is physically capable of the work but he is unable to work as a result of addiction and psychological problems, including chronic pain syndrome, attributable to his work injury, he has sustained a significant change in his compensable medical condition.

[¶ 25] Nor do the ALJ's findings necessarily indicate Huwe could not be awarded benefits if his inability to work is due to pain medication and resulting depression. Rather, the findings appear to be premised on the fact the records "suggest that other non-work related accidents from many years ago *may* have been a factor." (Emphasis supplied). The findings thus recognize the psychological component to Huwe's pain but again observe the records "suggest" it existed "long before his job became physically demanding" and conclude that while the "psychological component may well have been caused at least in part by his severe work-related injury . . . the record does not adequately address that possibility."

[¶ 26] These findings are imprecise and equivocal on the issue of whether or not the work injury and the resulting pain and depression are a substantial contributing factor in determining whether or not Huwe suffered a significant change in his compensable medical condition or an actual wage loss attributable to the change. That may be due in large part to Huwe's lack of reliance on those factors. While Huwe may not have relied on his addiction and psychologically based chronic pain syndrome, it is what the record reflects and not what Huwe relied upon which governs the decision of WSI in its determination and this Court in its appellate review under N.D.C.C. § 28–32–46.

V

[¶ 27] The findings of fact made by the agency on the issue of whether or not the pain medication and resulting depression from his work-related injuries substantially contributed to a significant change in Huwe's medical condition or an actual wage loss attributable to the change in medical condition do not sufficiently address the evidence presented to the agency. We reverse and remand to WSI for consideration and further findings on these issues under N.D.C.C. § 28–32–46(7).

[¶ 28] CAROL RONNING KAPSNER and MARY MUEHLEN MARING, JJ., concur.

MARING, Justice, concurring.

[¶ 29] I respectfully concur. After a thorough review of the medical evidence in

this record, I agree with the majority that the administrative law judge ("ALJ") did not sufficiently address the evidence presented by Huwe. I write only to further point out the medical evidence not addressed in the ALJ's decision.

[¶ 30] The record indicates that after his work injury Huwe continued to have severe headaches, which were thought to be "vascular and muscle contraction type headaches secondary to neck injury in December of 1992" according to the notes at Trinity Medical Center in 1998. It was also noted at that time that the patient was narcotic dependent. Huwe was experiencing numbness and tingling and weakness in both arms. The diagnostic considerations were cervical radiculopathy, thoracic outlet syndrome or severe musculoskeletal strain on neck and shoulders. He received several epidural injections.

[¶ 31] In 1999, Dr. Melissa Ray, a doctor of osteopathy, conducted a permanent partial impairment evaluation of Huwe at the request of WSI. His current complaints were "headaches from the posterior occipital region over the top of his head into the frontal skull region." He reported that his pain radiates "through the eyes." He also reported pain over the TMJs bilaterally, "posterior cervical spinal pain radiating from the superior aspect of the posterior neck medially to the inferior scapular regions," and "left lower back pain over the L5–S1 region, more on the left." Dr. Ray noted: "the patient reports depression due to his physical limitations and pain." Huwe reported to Dr. Ray that his symptoms had essentially remained the same over the past three years. He was taking aspirin and Lorcet. Dr. Ray noted Huwe was a recovering alcoholic and that his last drink was in 1981.

[¶ 32] Dr. Ray concluded Huwe suffered a 25 percent whole person impairment for his cervical spine injury, a 5 percent whole person impairment for his lumbar spine injury and a 12 percent whole person impairment for the TMJ, teeth problems and associated headaches. She found that these combined to equate to a 37 percent whole person impairment utilizing the combined values chart of the AMA Guides to the Evaluation of Permanent Impairment.

[¶ 33] On November 16, 1999, Huwe was admitted to Mercy Medical Center by Dr. Mark Olson. Dr. Olson noted that Huwe had a "history of Lorcet and other narcotic abuse from an occupational accident." Huwe had used up his prescription of Lorcet and was having withdrawal symptoms from Lorcet. Dr. Olson's impression was: "1. Narcotic withdrawal. 2. Chronic pain due to occupational accident. 3. Recovering alcoholic."

[¶ 34] In 2000, Huwe discussed with Dr. Olson and Dr. Moore, an orthopedic surgeon about undergoing a "provocative discography." Dr. Michael Moore told Huwe he could not do that without Huwe reducing his Lorcet tablets to no more than three a day.

[¶ 35] The ALJ found that a cervical discography was performed on February 1, 2001, and that Dr. Moore recommended an anterior discectomy and fusion at C4–C5 and C5–C6 based on the amount of degeneration. Huwe chose not to undergo surgery at that time.

[¶ 36] On June 17, 2003, Huwe attended physical therapy at Mercy Wellness Center. The physical therapist noted significant deficits in his cervical range of motion.

[¶ 37] On July 3, 2003, Huwe went to see Dr. Moore, an orthopedic surgeon, again. Dr. Moore noted he had seen Huwe in 2001 and "[w]e had discussed surgery with him previously in 2001, but

he decided to hold off on that until things got worse and he feels like he is at that point now." Dr. Moore noted that the "[p]atient uses no alcohol."

[¶ 38] On August 8, 2003, Dr. Moore reviewed Huwe's MRI and found no significant changes from his previous MRI study. He noted a history of difficulty of swallowing, ringing in ears, limited neck motion, neck pain, arthritis, fracture, frequent headaches, numbness in hands or feet, depression and anxiety. Dr. Moore recommended an anterior cervical discectomy and fusion C4 to C7. In 2001, Dr. Moore recommended fusion only from C4 to C6.

[¶ 39] Dr. Moore performed the surgery on September 2, 2003. Dr. Moore noted under "INDICATIONS: The patient is a 52–year–old gentleman with a long-standing history of neck pain and shoulder pain related to a work-related injury. Conservative treatment has been tried for a protracted period of time and been unsuccessful. Because of this the patient is judged to be a suitable candidate for the above-noted procedure." Dr. Moore carried out discectomies at each level of C4 to C7. The osteophytes were removed and the anterior/inferior lip of the superior vertebral body margin was removed. An Atlantis plate was then "opposed to the spine and bent into the increased lordosis which was demanded by the patient's alignment."

[¶ 40] On September 17, 2003, Huwe was seen for follow-up after his neck surgery. Huwe reported he had an 8 out of 10 pain in his anterior neck and chest. He reported his headaches were improved. Dr. Moore's nurse practitioner noted Huwe was to continue to protect his neck, but may wean himself out of his cervical collar. On October 1, 2003, Huwe returned for postoperative care to Dr. Moore's office. Huwe reported he was getting better, but his pain was still a 6 on a scale of 10. He denied use of alcohol. He was told to discontinue use of his cervical collar, but to continue to protect his neck and avoid lifting greater than 20 pounds. He was told they wanted to wean him off of Vicodin and replace it with Ultracet.

[¶ 41] Dr. Moore's nurse practitioner saw Huwe again on November 4, 2003, and December 5, 2003, when she said he could return to his normal daily activities.

[¶ 42] In October 2003, Huwe continued to see his physician, Dr. Mark Olson, and his nurse practitioner at Trinity Community Clinic. On October 21, 2003, he presented with complaints of increased neck pain and depression. The record notes: "He is having tears rolling down his face as he is talking to me." The nurse practitioner wrote: "I am quite concerned about his mental state and I am going to also place him on some Wellbutrin.... Obvious inadequate pain control at this time.... Would like him to return to Bone & Joint Clinic in Bismarck for follow up cares as his pain has increased." He was prescribed Oxycodone and Naproxen together with the Wellbutrin.

[¶ 43] On November 17, 2003, Huwe was again seen at Trinity Community Clinic. At that time, the record states: "Have discussed with him at some length that his physical dependence does not necessarily mean that he has an addiction to this [Oxycodone] although he does, because of his alcoholism, have an addictive type personality and he is agreeable with this course of action and will follow quite closely." Huwe was switched to some OxyContin with Oxycodone for breakthrough. He also was going to receive some epidurals. He was seen again on November 26, 2003, and it was noted he was doing much better with the OxyContin and Oxycodone.

[¶ 44] On December 10, 2003, the medical records of Trinity Community Clinic indicate he had relief from the epidural and is somewhat better with the OxyContin and Oxycodone. The nurse practitioner again notes "I think at this point I am worried about some depression. He was expecting better results from having this neck fusion surgery and have tried to explain to him it still can take up to three months before any pain relief from the fusion can be present."

[¶ 45] On December 23, 2003, the Trinity Community Clinic records indicate Huwe admitted he got drunk over the weekend. He was seen and evaluated at Mercy Recovery and was to start outpatient therapy as soon as possible. The assessment was "chronic neck pain, status post cervical fusion."

[¶ 46] Huwe was seen on January 9, 2004, at Trinity Community Clinic to renew his pain medications. The notes indicate he was to be seen at the pain clinic in Bismarck for regulation and pain management. On January 21, 2004, the notes state: "He continues to have an overlap of facet mediated pain and left sclatic pain. Degenerative changes to the low back."

[¶ 47] None of the foregoing medical records from Trinity Community Clinic are mentioned by the ALJ. The ALJ states that Huwe could not explain why the nurse practitioner's notes for Dr. Moore reflected a "more rosey picture." The fact that Huwe was receiving heavy pain medications in the form of OxyContin and Oxycodone from Dr. Mark Olson of Trinity Community Clinic might explain it, but the ALJ never mentions the treatment Huwe was receiving, including epidurals following his surgery.

[¶ 48] The records indicate that after the surgery, he had an emergency room visit in Williston on October 19, 2003, with complaints of neck pain after the fusion;

on February 2, 2004, for a narcotic overdose; and on May 13, 2004, with complaints of headaches and alcohol abuse.

[¶ 49] On February 2, 2004, Dr. Mark Olson noted he has "frequent visits to the emergency room because of the pain in his neck and back secondary to his accident that occurred in 1992." Dr. Olson wrote: "He admits that he is taking more alcohol and narcotics than prescribed. He states he has to do that to control the pain." Dr. Olson's impression: "[N]arcotic overdose likely accidental," and "[c]hronic pain." The plan was: "1. Given his history of abuse in the past, I think we are going to need to get Mercy Recovery Center and Dr. Greiner involved. 2. I think my job tonight is going to be getting him into the hospital and start weaning him off his narcotics."

[¶ 50] The ALJ found that Huwe's last day of physical presence at his job as a motor carrier inspector was February 4, 2004. Huwe then went on sick leave to attend a residential treatment program for his alcohol and narcotic over use at Mercy Recovery Center.

[¶ 51] On February 16, 2004, Huwe saw Dr. Mark Olson with slurred speech, dizziness, and confusion. Dr. Olson's impression was "[m]edication side effect."

[¶ 52] On March 3, 2004, Dr. Olson noted Huwe had been hospitalized with a very significant pneumonia and was also found to have acute bacterial endocarditis. Huwe was still under treatment for these conditions. On March 17, 2004, he was put back in the hospital.

[¶ 53] On April 7, 2004, Dr. Olson saw Huwe at the Trinity Community Clinic. Huwe came in regarding his pain. Dr. Olson wrote in his notes:

He was down and saw Carol Miller who did some trigger point injections. He thought there was some relief for a

short period of time, but the pain has returned at this point in his neck. He is wondering if he should get back on some type of narcotic. Carol Miller did mention in her note that the symptoms may be facet mediated pain and is thinking that facet injections may be worthwhile. Dr. Olson's plan was to set Huwe up in Bismarck for facet injections.

[¶ 54] On April 21, 2004, Huwe saw Dr. Olson because his wife was concerned he was suicidal. Dr. Olson wrote:

Apparently, two days ago he started drinking again. He had been doing very well, but two days ago something changed. He is blaming it on the pain, but he did not do anything different in his activities that would exacerbate the pain. He does have a history of chronic pain and history of depression in the past.

Dr. Olson referred him to Dr. Campos so he could get admitted into the inpatient unit.

[¶ 55] On May 5, 2004, Huwe was rechecked by Dr. Olson at Trinity Community Clinic for his neck and back pain. Dr. Olson noted: "He sits in his chair with a very flat affect. He is obviously very frustrated if not angry about the situation that he is in. He at one point expresses understanding of being off the narcotics and the next he is requesting there [sic] return." Dr. Olson planned to set Huwe up with Dr. Zhang to get a second opinion from a physiatrist to see if there is anything further that can be done to help with his back pain. Dr. Olson wrote: "It should be noted that I did not clear him to go back to work. We will wait until after Dr. Zhang has had a chance to review things."

[¶ 56] On May 13, 2004, Huwe went to the emergency room of Mercy Medical Center complaining of chronic head and neck pain and requesting treatment for acute and chronic alcohol abuse.

[¶ 57] On May 19, 2004, Huwe saw Dr. Moore, the orthopedic surgeon. Huwe reported he continued to have neck pain, occipital headaches, frontal headaches, as well as lower back pain. Huwe told Dr. Moore he feels like he is about 10 percent better from his cervical fusion. Dr. Moore told him he did not have anything further to offer him and that he would refer him to Dr. Killen for long term pain management and for any disability and impairment issues.

[¶ 58] Huwe went to Dr. Olson at Trinity Community Clinic for his chronic neck and back pain on May 28, 2004. The notes indicate: "At this time he does look quite miserable. He has little motion to his neck since his fusion. He has no smell of alcohol at this time." The nurse practitioner explained she would not give him narcotics.

[¶ 59] The evidence in this record indicates that Huwe continued to suffer severe pain in his neck and severe headaches after his surgical fusion of C4–C7 in September 2003. The record repeatedly states Huwe had become narcotic dependent as a result of his pain and needed to be taken off narcotics. Dr. Zhang was of the opinion Huwe should undergo drug rehabilitation as well as a chronic pain management program. Without the availability of narcotics to control his pain, Huwe had begun to drink more heavily and his depression worsened to the point of suicidal ideation.

[¶ 60] After a thorough review of the record of this case, I agree with the majority that the findings of fact of the ALJ do not sufficiently address the medical evidence and the issue of whether Huwe sustained a significant change in his compensable medical condition and I agree the matter must be reversed and remanded.

[¶ 61] Mary Muehlen Maring

SANDSTROM, Justice, dissenting.

[¶ 62] Because I believe the majority has exceeded the scope of appellate review permitted under N.D.C.C. §§ 28–32–46 and 28–32–49, I respectfully dissent.

[¶ 63] The majority concludes WSI's findings of fact did not sufficiently address whether Huwe's psychological and addiction problems were a substantial contributing factor to a change in his compensable medical condition. As the majority concedes, however, not only did Huwe not raise or rely upon this argument to support his claim for benefits, he expressly disavowed any such reliance. The majority concludes, at ¶ 26, that the decision of WSI and this Court must be governed by "what the record reflects and not what Huwe relied upon." As this Court has noted, however, "judges are not ferrets, obligated to engage in unassisted searches of the record for evidence to support a [party's] position." *Vandeberg v. State,* 2003 ND 71, ¶ 7, 660 N.W.2d 568; *see also Linrud v. Linrud,* 552 N.W.2d 342, 345 (N.D.1996). Administrative agencies and ALJs are not ferrets, either. Parties have the duty to raise appropriate issues, delineate their arguments, and draw the court's or agency's attention to supporting evidence in the record. When a party has failed to raise an issue, and particularly when the party has expressly disavowed the issue, a court exceeds the appropriate scope of appellate review when it relies upon that issue to reverse the decision of an administrative agency.

[¶ 64] In this case, the majority has gone one step further. Having determined that the ALJ and WSI should have considered whether Huwe's psychological and addiction problems were a substantial contributing cause to a change in his compensable medical condition, the majority then reaches medical conclusions not drawn by any of the numerous medical experts who provided opinions in this case. Not a single doctor or health care provider indicated Huwe's psychological or addiction problems were caused by or related to the 1992 work injury. Yet, at ¶¶ 23–24, the majority draws the conclusions that "[t]he evidence suggests Huwe's narcotic dependency was a result of his medications for his neck and back pain and severe headaches" and that there was "considerable evidence" Huwe's addiction and psychological problems "stem from and are related to the injury." It is for the medical experts, not the courts, to "connect the dots" and determine whether a claimant's psychological and addiction problems are the "result of" or "stem from" a prior work injury. This record is devoid of any expert opinion making that connection.

[¶ 65] There was, of course, one medical expert who offered an opinion on the connection between Huwe's psychological and addiction problems and his work injury. Dr. Cooper testified that Huwe's psychologically based chronic pain syndrome was not caused by his work injury and that Huwe's addiction and psychological problems were "nonwork-related." The majority does not address Dr. Cooper's testimony when it concludes WSI did not adequately address the evidence in the record about the causal connection between Huwe's psychological and addiction problems and his prior work injury.

[¶ 66] The ALJ and WSI recognized that the psychological component of Huwe's chronic pain may have been caused in part by his work injury, but found "the record does not adequately address that possibility." As a claimant seeking reinstatement of disability benefits, Huwe had the burden of presenting evidence demonstrating a significant change in his compensable medical condition and a resulting wage loss. *Aga v. Workforce Safety & Ins.,* 2006 ND 254, ¶ 13, 725 N.W.2d 204; *Sorlie v. Workforce Safety & Ins.,* 2005

ND 83, ¶ 15, 695 N.W.2d 453. The ALJ and WSI correctly concluded that he failed to do so.

[¶ 67] Although acknowledging at ¶ 8 that "[c]ourts exercise only a limited review in appeals from administrative agency decisions," the majority has effectively usurped the function of claimant's counsel by raising and deciding an issue expressly disavowed by counsel, usurped the function of the expert medical witnesses by drawing its own conclusions from the medical evidence, and usurped the function of the ALJ and the agency by ignoring the evidence presented by the one medical expert who actually provided an opinion on the issue and concluding the agency's findings of fact did not adequately address the issue. Applying the limited scope of review authorized by N.D.C.C. §§ 28–32–46 and 28–32–49, I would affirm the district court judgment affirming WSI's order denying Huwe's reapplication for disability benefits.

[¶ 68] DALE V. SANDSTROM and DANIEL J. CROTHERS, JJ., Concur.