857 A.2d 549

Grover MOORE

v.

COMPONENT ASSEMBLY SYSTEMS, INC. and Charter Oak Fire Insurance Co., Travelers Insurance Co.

No. 0002, Sept. Term, 2004.

Court of Special Appeals of Maryland.

Sept. 7, 2004.

Marc J. Atas, Baltimore, for Appellant.

James I. Smiley (Law Office of Joseph Jagielski on the brief), Baltimore, for Appellee.

Panel: SONNER, KENNEY, CHARLES E. MOYLAN, Jr. (retired, specially assigned), JJ.

CHARLES E. MOYLAN, Jr., Judge, retired, specially assigned.

This expedited appeal is from a decision of the Circuit Court for Baltimore City affirming a decision of the Workers' Compensation Commission, that discontinued a claimant's temporary total disability benefits after scheduled remedial surgery had to be postponed because of the claimant's medical condition. The parties have proceeded on an Agreed Statement of the Case and Facts.

### A Work–Related Injury

The appellant, Grover Moore, was injured on October 21, 1999, while working on a job for Component Assembly Systems, Inc., one of the appellees. The other appellee is Travelers Insurance Company, the workers' compensation insurer for Component Assembly Systems. Moore suffered injuries to his left leg and his left foot. There was no dispute over the fact that Moore was, because of the injury to his foot, unable to return to work. He applied to the Workers' Compensation Commission for benefits; the Commission decided that he was entitled to Temporary Total Disability benefits beginning on October 22, 1999, the day after the accident. Without objection, Travelers paid Moore the temporary total benefits for the

three year period of October 22, 1999, through October 8, 2002.

### The Hope for Remedial Surgery

The complicating factor that has given rise to this litigation grew out of an examination of Moore by Dr. Ian Weiner. Dr. Weiner was of the opinion that Moore was a good candidate for surgery to his left foot. Dr. Weiner believed that Moore could not return to work without the surgery but that, if the surgery were successful, Moore could return to work at the end of his post-operative convalescence. On July 22, 2002, Dr. Weiner scheduled the surgery for October 1, 2002. October 1 thereby became the target date to which all parties were looking in expectation of the termination of the disability.

### The Hope Deferred

In October, however, those high hopes were dashed, and controversy began to swirl 1) over why the scheduled foot operation could not go forward; and 2) over when, if ever, it could be rescheduled. It developed that Moore had had high blood pressure since 1989 and had, at least intermittently, been taking medication for it since 1999. In October of 2002, moreover, Moore was diagnosed with coronary artery disease. He underwent angioplasty on November 19. A stent was installed to clear a blockage in an artery to the heart caused by cholesterol. After the procedure, Moore's cardiologist, Dr. Rodney Johnson, ordered him onto a daily regimen of aspirin therapy until further notice. Aspirin is a blood thinner and helps to guard against undue blood clotting.

Because of the blood-thinning effect of the aspirin, with its attendant danger of bleeding complications during surgery, Dr. Weiner declined to go forward with the foot surgery until he received assurance from Dr. Johnson that the aspirin therapy could be safely discontinued for a period of two days. As of October 2002, the scheduled date for the foot surgery, Dr. Johnson had refused to authorize any break in the daily aspirin therapy.

Although the Agreed Statement of Facts leaves it less than totally clear, it does appear that all parties expected that the foot surgery that had to be postponed in October would be rescheduled for sometime in February of 2003. Some such mutual understanding seems to have been the basis for a compromise agreement between Travelers and Moore for the payment of benefits during the four-month period between October 16, 2002 and February 10, 2003. For that period, it was agreed that Travelers would pay to Moore one-half of the amount of temporary total benefits that would otherwise have been due. No issue is before us with respect to that compromise agreement.

That expected rescheduling of the foot surgery for February, however, did not take place. It was not until October 23, 2003, that Dr. Johnson finally cleared Moore for the surgery by authorizing him to stop taking aspirin for a period of 48 hours after the surgery. Following that clearance, Moore's first available appointment with Dr. Weiner was on November 24, 2003. The foot surgery was rescheduled and was successfully performed on January 8, 2004.

### The Rulings Below

When the foot surgery that had been expected to take place in February of 2003 was deferred to an uncertain future time, Travelers discontinued the payment of temporary total disability benefits. Moore petitioned the Commission to order the appellees to resume the payment of temporary total benefits. The Commission held a hearing and, on May 5, 2003, ruled that "the issue of temporary total disability from February 11, 2003 to date and continuing is denied." Moore appealed that decision to the Circuit Court for Baltimore City, which on February 11, 2004, affirmed the Commission. Moore has, in turn, appealed that decision by the circuit court to us.

### Was There a Break in The Compensable Temporary Disability?

The issue is a narrow one. There are no less than four time periods involved in this case, but the actual controversy is with respect to only one of them.

PERIOD 1: From October 22, 1999, the day after the accident, through October 8, 2002, the week after the foot surgery had first been scheduled, the Commission properly ordered the appellees to pay Moore temporary total benefits. There is no dispute over the fact that this was a time of **COMPENSABLE TEMPORARY DISABILITY.**

PERIOD 2: From October 16, 2002, right after the foot surgery was first postponed, through February 10, 2003, the time to which the foot surgery was first postponed, the mutual agreement between Moore and the appellees provided that Travelers would continue to pay Moore one-half of his temporary total benefits. By agreements of the parties, this continued to be a time of **COMPENSABLE TEMPORARY DISABILITY.**

PERIOD 3: From February 11, 2003, when Travelers discontinued temporary total benefit payments, until January 8, 2004, when Moore had his foot surgery and Travelers voluntarily resumed payments of temporary total benefits, the parties are in diametric disagreement as to whether this continued to be a period of compensable temporary disability.

PERIOD 4: When Moore had his foot surgery on January 8, 2004, Travelers voluntarily resumed payments of temporary total benefits. This period the appellees necessarily concede to be a period of **COMPENSABLE TEMPORARY DISABILITY.**

Thus, from October 22, 1999, through January 8, 2004, a period of four years and three months, the only arguable break in the compensable temporary total character of the indisputably continuing disability was the 11–month period between February 11, 2003, and January 8, 2004. There had been a period of temporary total disability prior to that arguable break. There was to be a period of temporary total disability following that arguable break. The question before us is whether something happened on or about February 11, 2003, to terminate, or at least to interrupt, the legally binding nature of the continuing temporary disability.

## Responsibility For the Prolongation
## Of a Temporary Disability

The triggering event for such an interruption, from the appellees' point of view, was the second postponement of the surgery coupled with apparent uncertainty as to when, if ever, it could be rescheduled. The appellees, to be sure, had once been hopeful that Moore's temporary disability would come to an end shortly after the surgery first scheduled for October 1, 2002. When that surgery was postponed for a period of four months, the appellees nonetheless agreed, apparently somewhat grudgingly, that the temporary nature of the disability was still continuing. At least, they continued to make partial payments on that basis.

The critical event for them was the second postponement of surgery from February of 2003 to some uncertain future time. The appellees do not argue that Moore's disability itself had terminated on February 11, 2003, only that their responsibility for it had terminated. Nor do they argue that a temporary disability had, because of some apparent likelihood that the surgery could never be done, on that date been transmuted into a permanent disability. They focus, rather, on the prolongation *per se* of the temporary disability and argue that that prolongation was the result of a superseding, intervening cause, to wit, the heart condition giving rise to the necessity for Moore to continue the daily aspirin therapy. They argue that, because the work-related injury was not the cause of the prolongation of the disability, they are relieved of liability for the prolonged or extended period of disability. The appellees state their position in their brief:

> It was not because of the Appellant's injury due to the accident that *he has been unable to work,* but instead *due to his unrelated medical condition which was preventing him from getting the treatment he required.*

(Emphasis supplied).

They go on to develop that argument more fully.

> In the case at bar, we have *a claimant who,* after the accident, *found out that he could not have reparative sur-*

*gery due to the onset of a heart condition. This new condition breaks the causal nexus required for the continued payment of temporary total disability benefits.*

Requiring the Appellees to pay temporary total disability benefits during this period is essentially asking them to support the Appellant during an unrelated infirmity. As was argued before the Commission, this is akin to a claimant who is out for a finger injury but cannot return to work because of a subsequent injury to another body part while he or she is still recuperating. *It is this new occurrence keeping the Appellant out of work.* Because of *the break in the nexus,* we do not reach the question of whether the new occurrence is interfering with the Appellant's ability to recuperate.

*The doctors did not know how long the heart condition would preclude him from getting the surgery.* In fact, *one doctor later opined that it would be better for him to never get the surgery.* Until the Appellees discovered this, they, as a courtesy, were continuing the temporary total benefits until the heart condition cleared up sufficiently to allow the surgery. *This significant delay breaks the chain of causation between his employment and his injury.* Thus, *the Appellees are not responsible after the chain breaks.* Once the chain repaired itself, the Appellees commenced temporary total disability and continue to pay it.

(Emphasis supplied).

### The Obligation to Undergo Reasonable Remedial Treatment

The law in Maryland has long been settled that a claimant may not prolong a period of compensable disability by refusing to submit to medical or surgical treatment if, objectively measured, a reasonable man would ordinarily submit to treatment under similar circumstances. If, on the other hand, it would be objectively reasonable to refuse to submit to treatment or to postpone treatment, compensability for the continuing disability is not adversely affected. In *Schiller v.*

*Baltimore and Ohio Railroad Company,* 137 Md. 235, 246, 112 A. 272 (1920), the Court of Appeals stated:

> The overwhelming weight of authority is that a man cannot continue to receive compensation and at the same time refuse to submit to proper medical or surgical treatment such as an ordinarily reasonable man would submit to in like circumstances.

*R.N. McCulloh and Company v. Restivo,* 152 Md. 60, 136 A. 54 (1927), fleshed out more fully the standard for measuring whether the refusal "to accept medical or surgical attention" is reasonable. The employer there had been ordered to pay compensation to Restivo "during the continuance of his temporary partial disability." 152 Md. at 63, 136 A. 54. On appeal to the circuit court, the employer sought to have the jury instructed that, if it found that the "claimant's condition would have progressed . . . except for the failure of the claimant to accept medical attention from the employer and/or insurer, . . . thereby prolonging his disability," it should refuse to order further compensation. 152 Md. at 64–65, 136 A. 54.

The Court of Appeals began its review by posing

> a single question, which is *whether the claimant prolonged his injuries by a wilful* or negligent *failure to receive* proper and *necessary* medical or *surgical attention.*

152 Md. at 65, 136 A. 54 (emphasis supplied).

The Court restated the employer's argument and then rejected it.

> *The theory* of the prayer *is that if Restivo "failed to accept medical attention* offered to him" by appellants, and failed to procure "proper" medical attention elsewhere, *and that by reason of such failure his disability was prolonged,* that *such failure barred his right to further compensation.* But *that is not the law.*

152 Md. at 66, 136 A. 54 (emphasis supplied).

### The Critical Criterion Is the Reasonableness of the Refusal

The employer's requested prayer "was not the law" because it ignored the critical question of whether a refusal to submit

to surgery was reasonable under the circumstances. The Court of Appeals continued:

> [I]t is also bad [law] because *the fact that Restivo had refused to accept* medical or *surgical attention and that his refusal prolonged or aggravated his injury did not determine his right to further compensation,* because *it may have been that the treatment offered,* even if it were the proper treatment, *would have subjected him to such risk,* pain, or inconvenience, *that as a reasonably prudent and careful man he would have preferred to endure the existing disability* rather than accept the treatment.

152 Md. at 66–67, 136 A. 54 (emphasis supplied).

The Court was quite clear that the question of whether the refusal of a claimant to accept surgery has prolonged the period of temporary disability cannot be divorced from the question of whether the refusal was objectively reasonable.

> It may be conceded that *it is the duty of an injured employee to accept* any medical or *surgical assistance* available to him, *which offers a reasonable hope for the lessening of any disability* resulting from the injury for which he is compensated, *provided such assistance involves no real risk to life or health,* nor is likely to cause such pain or inconvenience, which as a reasonably prudent man he could not be expected to undergo. But *those qualifications are quite as vital as the rule itself, and cannot be disregarded in any application of it.* In other words, *the question is not simply whether the claimant refused* medical or *surgical attention, but whether* under the circumstances of the case *his refusal* to accept such treatment *was arbitrary or unreasonable.*

152 Md. at 66, 136 A. 54 (emphasis supplied).

██ Notwithstanding the prolongation of a temporary disability that might, with surgery, have been ameliorated, if the cause for the prolongation was objectively reasonable, the employer's responsibility for the temporary disability continues unabated. In this case, Dr. Weiner's refusal to perform foot surgery on Moore until Moore's cardiologist gave him

clearance to discontinue for 48 hours the use of blood-thinning aspirin was indisputably reasonable. The danger of "bleeding complications" during the surgery posed a threat to Moore's life. The appellees do not dispute that factual issue.

## The Causal Nexus: What Breaks the Chain?

What they dispute, implicitly at least, is the controlling law. Even in the face of the caselaw, they continue to insist that the delay in the foot surgery because of Moore's heart condition "breaks the causal nexus required for the continued payment of temporary total disability benefits." They continue to argue that "[t]his significant delay breaks the chain of causation between [Moore's] employment and his injury" and that "the appellees are not responsible after the chain breaks."

The same argument, in the same language, was made by the employer in *Watts v. J.S. Young Company,* 245 Md. 277, 225 A.2d 865 (1967). A hand specialist "recommended further surgery to repair the claimant's hand and wrist." With this recommended surgery, there would have been "reason to think that he stands a chance of an excellent improvement and that his disability could be reduced to somewhere in the neighborhood of 5%." 245 Md. at 279, 225 A.2d 865. The claimant refused the surgery, however, and the employer argued that the refusal "breaks the chain of causation."

The Court of Appeals first made it clear that the law it was announcing about the reasonableness of a refusal to undergo surgery was not limited to cases involving temporary total disability but applied across the board to any disability, temporary or permanent.

> The claimant concedes that *the test of reasonableness applies where an award of temporary total compensation is discontinued because of a refusal to undergo surgery, Schiller v. Baltimore & Ohio R.R. Co.,* but argues that the test does not apply to a denial of permanent partial compensation. This distinction is nowhere made in the cases on the subject, and we see no logical basis for it. The rationale, a break in the chain of causation between employment and

injury, applies equally to both situations. *[T]he duty of an injured employee to accept medical assistance which a reasonably prudent man would undergo extends to "any disability," whether temporary or permanent in nature.*

245 Md. at 280, 225 A.2d 865 (emphasis supplied).

The Court of Appeals then reaffirmed that the reasonableness of a refusal to undergo surgery is measured by an objective test.

*The test is one of reasonableness. It is an objective standard.* The claimant's own fears and beliefs have no bearing on the test except as they relate to how a reasonable man would act under the same circumstances. In *McCulloh,* our predecessors indicated many of the factors to be considered in determining the reasonableness of a claimant's refusal to undergo further medical treatment: *the chance of success and the benefit to be gained must be weighed against the risk to life and health* and the pain and inconvenience involved in the treatment.

245 Md. at 281, 225 A.2d 865 (emphasis supplied).

## A Reasonable Prolongation Does Not Break The Chain of Causation

██ An unreasonable refusal to undergo corrective surgery will, in the appellees' words, "break the chain of causation between [a claimant's] employment and the injury," but a reasonable refusal will not.

*The Workmen's Compensation Commission has authority to withhold an award if the claimant's refusal to undergo surgery is unreasonable. McCulloh & Co. v. Restivo (1927); Schiller v. Baltimore & Ohio R.R. Co. (1920). The claimant's intentional and unreasonable conduct breaks the chain of causation between his employment and the injury.* To the extent that the claimant's disability is found to relate to his arbitrary refusal, it does not "arise out of his employ-

ment" and is non-compensable under the Workmen's Compensation statute.

245 Md. at 280, 225 A.2d 865 (emphasis supplied).

We also find persuasive the opinion of the Court of Appeals of South Carolina in *Orr v. Elastomeric Products*, 323 S.C. 342, 474 S.E.2d 448 (1996). Following an injury to her back, an employee was awarded temporary total disability benefits. The employee underwent spinal surgery followed by continuing physical therapy. When she became pregnant, however, the employee discontinued the physical therapy for the period of her pregnancy. Although the disability continued, the South Carolina Workers' Compensation Commission ruled that the employer "did not have to pay temporary total compensation during the time she was not participating in her treatment program." 474 S.E.2d at 449. The circuit court affirmed the Commission's ruling. ·

The Court of Appeals, however, reversed the circuit court, holding that the claimant's inability to work was still due to her injury and not to her pregnancy and that the prolongation, caused by the pregnancy, of the period of temporary disability did not alter that overriding fact.

> Under South Carolina workers compensation law, *a claimant is entitled to compensation for a total disability resulting from a work-related injury.* The term "disability" is defined as "incapacity because of injury to earn the wages that the employee was receiving at the time of the injury in the same or any other employment." *The fact that Orr's pregnancy indirectly prolonged the period during which she was unemployable does not change the fact that her injury, not her pregnancy, rendered her unable to work.*

474 S.E.2d at 449 (emphasis supplied).

By the same token, Moore, in the case before us, was unable to work for the 11–month period in dispute because of the injury to his foot, not because he was required to take an aspirin a day.

We also find persuasive the opinion of the Supreme Court of Vermont in *Wood v. Fletcher Allen Health Care*, 169 Vt. 419,

739 A.2d 1201 (1999). After the employee there had been receiving temporary total disability benefits for two years, her treating physician recommended that she have surgery to her shoulder to correct her work-related symptoms. Because the employee was pregnant, however, the surgery had to be delayed until after the birth of the employee's child.

The employer sought "to discontinue claimant's temporary total disability payments when she became pregnant and was, as a result, temporarily unable to have surgery to correct her workplace injury." 739 A.2d at 1203. The employer attributed the prolongation of the period of temporary total disability to the "superseding intervening act of getting pregnant." *Id.* The Vermont Supreme Court refused to accept the employer's characterization of the pregnancy as a "superseding, intervening event."

> [W]e reject [the employer's] argument that claimant's pregnancy was a superseding, intervening event that broke the causal connection between the work-related accident and claimant's disability.

739 A.2d at 1206.

With respect to a postponement of surgery that prolongs a period of temporary disability, the Vermont Supreme Court held that the critical criterion is not the effect of postponing surgery but the reasonableness of the postponement.

> [The employer] argues that claimant refused medically-indicated corrective surgery and should be denied benefits on that basis. The Commissioner ruled that the benefits could be discontinued only if the refusal of the surgery was unreasonable. *He found that,* in this case, *the delay in the surgery was reasonable because it was recommended by claimant's physician.*
>
> ... *We agree with the Commissioner that claimant's decision to delay the surgery was not unreasonable in light of her physician's recommendation.*

*Id.* (emphasis supplied).

The Vermont Supreme Court also made it clear that its *ratio decidendi* was not one dealing narrowly with pregnancy

cases but was one of broader applicability to conditions generally that may delay treatment but are not themselves disabling.

> Contrary to [the employer's] claim, we do not read the Commissioner's decision as creating a special status for pregnant workers. Instead, the Commissioner applied *a general policy not to disqualify a worker from temporary total disability benefits because of a condition that delays treatment* for a work-related disabling condition, *but is not itself disabling.*

*Id.* (emphasis supplied).

## CONCLUSION

We hold that, because the postponement of Moore's foot surgery was eminently reasonable, the payment of his temporary total disability benefits should not have been terminated during the period of that postponement.

**JUDGMENT REVERSED AND CASE REMANDED TO WORKERS' COMPENSATION COMMISSION FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION; COSTS TO BE PAID BY APPELLEES.**