2014 ND 26

**Rick BROCKEL, Appellant**

v.

**NORTH DAKOTA WORKFORCE SAFETY & INSURANCE,**
Appellee.

**No. 20130166.**

Supreme Court of North Dakota.

Feb. 13, 2014.

Dean J. Haas, Bismarck, N.D., for appellant.

Mitchell D. Armstrong and Brian Schmidt, Special Assistant Attorneys General, Bismarck, N.D., for appellee.

KAPSNER, Justice.

[¶ 1]   Rick Brockel appeals from a judgment affirming an order of Workforce Safety and Insurance ("WSI") denying him medical benefits and terminating his disability benefits.  We conclude WSI's finding that Brockel's right vertebral artery occlusion is not causally related to his work injury is supported by a preponderance of the evidence.  We also conclude Brockel was denied a fair hearing because he was not provided notice that one of the grounds for terminating his disability benefits would be the failure to submit medical verification of his disability.  We further conclude WSI's finding that Brockel failed to show his wage loss was the result of his compensable injury is not in accordance with the law.  We affirm in part, reverse in part, and remand for retroactive reinstatement of Brockel's disability benefits and for further proceedings.

I

[¶ 2]   On September 27, 2010, Brockel sustained a work-related injury to his left shoulder, cervical spine, and left ribs when he was involved in a motor vehicle accident.  WSI accepted liability and paid medical and disability benefits.  WSI later accepted liability for a head injury and cervical myelomalacia related to Brockel's cervical spine injury.  Brockel's primary physician placed Brockel under work restrictions requiring "one handed work only . . . no pushing, pulling, and lifting greater than 5 lb."

[¶ 3]   Brockel complained of instances of dizziness and light-headedness, and he was referred to the Mayo Clinic where his evaluation and care were managed by Dr. Russell Gelfman.  Doctors there noted Brockel's left shoulder injury had not resolved, and an MRI revealed the nonunion of a fracture.  Doctors also diagnosed a right vertebral artery occlusion which lim-

its the flow of blood when Brockel rotates his head to the right.  A doctor noted the nonunion of Brockel's left shoulder fracture would require surgery to repair, but concluded surgery was "fraught with risk" because Brockel's right vertebral artery occlusion might "shut off" the right carotid artery and cause a stroke during the surgical procedure.  When WSI asked Dr. Gelfman whether Brockel could participate in a functional capacity assessment ("FCA"), the doctor responded that Brockel's tolerance could be tested but he might need "additional restrictions," such as to not "look over his shoulder."

[¶ 4]   WSI asked Dr. Gelfman whether the motor vehicle accident was "a substantial and contributing factor to the diagnosis of" Brockel's right vertebral artery occlusion, and the doctor checked "No" on the form.  Three months later, Dr. Gelfman clarified that because of the complexity of the case he had consulted the neurosurgeon who had made the initial diagnosis and "it is our belief that this can reasonably be attributed to a traumatic cause; therefore, the motor vehicle accident of 9–27–2010 would represent a substantial and contributing factor."

[¶ 5]   WSI obtained an independent medical examination ("IME") from Dr. Mark Larkins who opined that the right vertebral artery occlusion "appears to predate Mr. Brockel's motor vehicle accident" and "there is not enough evidence to support a relationship between Mr. Brockel's motor vehicle accident and the right vertebral artery occlusion."  Dr. Larkins stated that it would be difficult for Brockel to return to work without surgery because of the danger involved.  Brockel had another IME performed by Dr. Thomas Nelson.  Upon examination, Dr. Nelson concluded Brockel had no permanent orthopedic disability or impairment from the accident, but he would benefit from surgery on his

left shoulder. Dr. Nelson understood concerns about the surgery because of the right vertebral artery occlusion, but believed the surgery could be performed "with careful positioning of Mr. Brockel's head." Dr. Nelson said Brockel continued to require activity restrictions:

> At the current time, Mr. Brockel does require activity restrictions with respect to his left arm. Specifically, I would allow lifting from floor to waist at 20 pounds, from waist to shoulder level of 10 pounds, and no lifting overhead. Other than that, he requires no other work or activity restrictions.

[¶ 6] On March 12, 2012, WSI sent Brockel a "notice of decision denying medical condition" informing him it was not liable for the right vertebral artery occlusion because this condition "was not caused by the motor vehicle accident, but was there prior to the accident." On the same date, WSI sent Brockel a "notice of intention to discontinue/reduce benefits" informing him:

> Due to your right vertebral artery occlusion condition, you are unable to participate in Vocational Rehabilitation services, nor are you released to return to work. Since the Right Vertebral Artery Occlusion is your primary disabling factor, and WSI has no liability for that non work related condition, wage loss benefits must be terminated.

[¶ 7] Brockel requested a hearing, during which he testified on his own behalf and Dr. Larkins testified on behalf of WSI. Following the hearing, the administrative law judge ("ALJ") affirmed WSI's decision denying medical and disability benefits, reasoning:

> 1. A "compensable injury" means an injury by accident arising out of and in the course of hazardous employment which must be established by medical evidence supported by objective medical findings. Section 65–01–02(10), N.D.C.C. A claimant has the burden of proving by a preponderance of the evidence that he has suffered a compensable injury and is entitled to benefits. Section 65–01–11, N.D.C.C. Mr. Brockel has the burden of proving that his right vertebral artery compression is substantially related to his work injury. Mr. Brockel has right vertebral artery occlusion at C5–6 which he claims is substantially related to his September 27, 2010 motor vehicle accident. The greater weight of the evidence does not show that the right vertebral artery occlusion is substantially related to an acute injury suffered in the motor vehicle accident and no doctor has opined that Mr. Brockel's vertebral artery occlusion would not have progressed similarly in the absence of the work injury. Mr. Brockel argues that he didn't have symptoms related to vertebral artery occlusion before his work injury, but that is not enough to establish causation. Compensability may not rest on surmise or conjecture. *Inglis v. North Dakota [W]orkmen's Comp. Bureau*, 312 N.W.2d 318 (N.D.1981). The most credible medical opinions in his case support a finding that the vertebral artery occlusion is not substantially related to the motor vehicle accident, as Mr. Brockel claims. There are no credible medical opinions ascribing this condition to any other work-related traumatic event. On this record, it cannot be said that Mr. Brockel has sustained his burden to show that the right vertebral artery occlusion is substantially related to his work injury.

> 2. An injured employee's doctor shall certify the period of disability and the extent of the injured worker's abilities and restrictions. N.D.C.C. § 65–05–08.1. The only evidence in the record

regarding Mr. Brockel's disability is that he has work restrictions related to his left arm. There is no certification from any doctor removing Mr. Brockel from work. In fact, Dr. Nelson says that Mr. Brockel has no permanent orthopedic disability or impairment from the work injury. Mr. Brockel does require work restrictions, but there is no evidence that a doctor has certified that Mr. Brockel is unable to work because of his work injury. Accordingly, Mr. Brockel has failed to establish the requirements for verifying disability.

3. It is the burden of the employee to show that the inability to obtain employment or to earn as much as the employee earned at the time of injury is due to physical limitation related to the injury, and that any wage loss claimed is the result of the compensable injury. N.D.C.C. § 65–05–08(6). The evidence shows that Mr. Brockel requires activity restrictions with respect to his left arm, but he is not unable to work. Mr. Brockel does have non-work-related vertebral artery occlusion, which according to Dr. Larkins, makes it dangerous to work, and according to Dr. Gelfman, requires work that does not require Mr. Brockel to look over his right shoulder. If Mr. Brockel is unable to obtain employment because of the vertebral artery occlusion, or understandably determines not to pursue employment because of the risks associated with his condition, the wage loss is not the result of the compensable injury.

The district court affirmed WSI's decision.

## II

[¶ 8] Brockel argues WSI erred in denying him medical and disability benefits.

[¶ 9] In *Carlson v. Workforce Safety & Ins.*, 2012 ND 203, ¶¶ 11–12, 821 N.W.2d 760, we explained:

Courts exercise limited review in appeals from decisions by an administrative agency under the Administrative Agencies Practice Act, N.D.C.C. ch. 28–32. *Sloan v. North Dakota Workforce Safety & Ins.*, 2011 ND 194, ¶ 4, 804 N.W.2d 184. Under N.D.C.C. § 28–32–46, a district court must affirm an administrative agency order unless:

1. The order is not in accordance with the law.
2. The order is in violation of the constitutional rights of the appellant.
3. The provisions of this chapter have not been complied with in the proceedings before the agency.
4. The rules or procedure of the agency have not afforded the appellant a fair hearing.
5. The findings of fact made by the agency are not supported by a preponderance of the evidence.
6. The conclusions of law and order of the agency are not supported by its findings of fact.
7. The findings of fact made by the agency do not sufficiently address the evidence presented to the agency by the appellant.
8. The conclusions of law and order of the agency do not sufficiently explain the agency's rationale for not adopting any contrary recommendations by a hearing officer or an administrative law judge.

We review administrative agency decisions in the same manner as the district court. N.D.C.C. § 28–32–49. "In reviewing the agency's findings of fact, we do not make independent findings or substitute our judgment for the agency's judgment." *Sloan*, 2011 ND 194, ¶ 5, 804 N.W.2d 184. This Court instead decides "whether a reasoning mind reasonably could have determined the find-

ings were proven by the weight of the evidence from the entire record." *Id.* Similar deference is given to an independent ALJ's factual findings. *Id.* No deference is given to an ALJ's legal conclusions. *Id.* "Questions of law, including statutory interpretation, are fully reviewable on appeal." *Id.*

### A

[¶ 10] Brockel argues WSI's decision denying him medical benefits for his right vertebral artery occlusion should be reversed because the preponderance of the evidence establishes that this condition is causally related to the motor vehicle accident.

[¶ 11] Under N.D.C.C. § 65–01–11, a claimant seeking workforce safety and insurance benefits has the burden of proving by a preponderance of the evidence that the claimant has suffered a compensable injury and is entitled to benefits. *See, e.g., Bergum v. North Dakota Workforce Safety & Ins.*, 2009 ND 52, ¶ 11, 764 N.W.2d 178. To carry this burden, the claimant must prove by a preponderance of the evidence that the medical condition for which benefits are sought is causally related to a work injury. *See, e.g., Bruder v. North Dakota Workforce Safety & Ins.*, 2009 ND 23, ¶ 8, 761 N.W.2d 588. "Although it is not necessary to show that the employment was the sole cause of the injury, to establish a causal connection the claimant must demonstrate that his employment was a substantial contributing factor to the disease or injury." *Id.* WSI has the responsibility to weigh the credibility of medical evidence and resolve conflicting medical opinions, but it must resolve this conflicting evidence in a reasoned manner. *See, e.g., Huwe v. Workforce Safety and Ins.*, 2008 ND 47, ¶ 10, 746 N.W.2d 158.

[¶ 12] WSI based its decision primarily on the evidence presented by Dr. Larkins. Brockel argues Dr. Larkins' medical opinion is flawed because it is based on his review of an incomplete medical history which actually shows Brockel complained of instances of dizziness and light-headedness shortly after the motor vehicle accident. However, the record does not support Brockel's argument. Dr. Larkins testified he did review Brockel's medical records noting complaints of dizziness, but believed the symptoms of the vertebral artery occlusion would have been more "robust" than recorded in the medical records. Dr. Larkins, after concluding that he could not say the vertebral artery occlusion was the result of the motor vehicle accident, explained:

Q. And what is the pathology at C5 and 6?

A. Well, at C5–6 he's got intermittent occlusion of his vertebral artery. The vertebral artery reconstitutes above that. He also becomes symptomatic when he turns his head to the right with dizziness, and apparently he told me he actually frankly passes out. I couldn't relate that to the original accident.

Q. Why not?

A. My problem is that I'm so dependent on the contemporaneous medical records that it didn't look like even with the neurology evaluation at Mayo—I think it was with Dr. Eggers—that there was mention made of that symptomatology. And you would think that that would be so noticeable and such a prominent part of your complaints from the very beginning. And my view is based on some degenerative change there, and I couldn't say that the accident even hastened that, because there really wasn't anything—any sort of concomitant injury in that region that would suggest it was injured enough to hasten

the degenerative changes that would have caused compression of that artery.

So no matter how you look at it, it was either an acute thing with a dissection of the vertebral artery or this secondary degenerative compression of the artery in the frame or window that it passes through. I couldn't say with any certainty in looking at the records or from his description that this occurred at the time of the accident. I just didn't have enough to go on with that.

. . . .

Q. . . . Does not having it before the accident, I guess, affect your opinion of whether it's caused by the accident, based on your review?

A. Well, you know, my biggest problem is the time lag after the accident. You know, I do totally understand that he didn't have it before. But the fact that this wasn't so problematic until quite some time after the accident or even identifiable, that's my primary thing. Obviously, I didn't have a chance to examine him or ask him questions when this happened or at any time until I saw him on one occasion, so I have to rely on those notes. Certainly the fact that he didn't have it before would make you wonder if the accident caused it if he was having it right after the accident. But my problem is it wasn't mentioned for quite some time. And these are pretty disturbing complaints.

. . . .

A. I would think he would have noticed it right away. The way he described it to me, it was pretty robust. This isn't just dizziness. This is a big deal where he's having a diminished level of consciousness. He described it to me—I think he put it like almost passing out when this happens. I would have thought that that would have been a feature almost immediately, especially if

there's a hematoma there or something. That would have been very obvious with maybe even less head movement initially than later on down the line. It certainly wouldn't have—if he had something big enough there to cause a problem, I would think he would have been symptomatic right away.

Q. You mean within days of this he'd have turned his head to the right and fallen down?

A. Well—or at least noticed some severe problems, yeah, absolutely.

[¶ 13] The ALJ noted the lack of "robust" symptoms reported by Brockel immediately after the accident. The ALJ further noted that, in his second opinion, Dr. Gelfman did "not explain how the work injury may have acted on the preexisting arterial stenosis or the asteophytes to cause the occlusion in the absence of acute symptoms of occlusion after the accident." Upon our review of the record, we conclude a reasoning mind reasonably could have determined that the motor vehicle accident was not a substantial contributing factor to Brockel's right vertebral artery occlusion.

B

[¶ 14] Brockel argues he was denied a fair hearing because he was not provided notice that WSI intended to terminate his disability benefits for his failure to submit medical verification of his disability.

[¶ 15] To satisfy due process requirements, N.D.C.C. § 65–05–08.1(5) dictates notification procedures for terminating disability benefits when an updated medical report has not been filed with WSI or when the claimant has been released to work. *See Frohlich v. North Dakota Workers Comp. Bureau,* 556 N.W.2d 297,

302 (N.D.1996). Section 65–05–08.1(5), N.D.C.C., provides:

5. Prior to the expiration of a period of disability certified by a doctor, if a report certifying an additional period of disability has not been filed, or upon receipt of a report or other evidence indicating an injured employee who is receiving disability benefits has been or will be released to return to work, the organization shall send a notice to that employee of the organization's intention to discontinue benefits, including an explanation of the reason for discontinuing benefits, an explanation of the employee's right to respond, and the procedure for filing the required report or challenging the proposed action. A copy of the notice must be mailed to the employee's doctor. Thereafter, if the required certification is not filed, the organization shall discontinue disability benefits, effective twenty-one days after the date the notice of intention to discontinue benefits is mailed or the date on which the employee actually returned to work, whichever occurs first.

[¶ 16] The record does not disclose that WSI notified Brockel or any of the doctors involved in this case that it was seeking medical verification of Brockel's disability. Nor did WSI inform Brockel of the procedure for filing the report. None of the prehearing documents suggested that failure to verify disability would be an issue during the administrative hearing. The "notice of intention to discontinue/reduce benefits" did not mention verification of disability. WSI's April 9, 2012, order discontinuing disability benefits referenced N.D.C.C. § 65–05–08.1 and stated "[a]n injured employee's doctor shall certify the period of disability and the extent of the injured worker's abilities and restrictions." However, the order did not indicate Brockel failed to comply with the statute's provisions, but merely stated as the reason for terminating benefits that "[c]laimant has not proven that his September 27, 2010, work injury is his primary disabling factor at this time." The ALJ's "notice of hearing[,] specification of issues and prehearing order" also did not mention verification of disability, but simply stated:

The purpose of the hearing is for the parties to present evidence on the following issues: Whether Mr. Brockel's right vertebral artery occlusion at C5–C6 is a compensable injury; and whether Mr. Brockel is entitled to disability benefits after April 2, 2012.

The subject of disability verification was not even broached during the administrative hearing. For these reasons, WSI's assertion that Brockel waived his lack of notice argument by failing to raise it before or during the administrative hearing is without merit. It appears neither WSI nor Brockel was aware that verification of disability would be relied upon for terminating benefits until the ALJ issued her decision, after which Brockel promptly raised the lack of notice argument in his specifications of error to the district court.

[¶ 17] Until proper notice is given under N.D.C.C. § 65–05–08.1, WSI could not terminate Brockel's disability benefits on the basis that he failed to verify his disability. *See Flink v. North Dakota Workers Comp. Bureau*, 1998 ND 11, ¶ 19, 574 N.W.2d 784. Because Brockel was not adequately advised WSI contemplated terminating his disability benefits on the ground of lack of verification, we conclude Brockel was denied a fair hearing under N.D.C.C. § 28–32–46(4).

C

[¶ 18] Brockel argues WSI erred in finding he failed to show that his wage

loss for disability purposes was the result of his compensable injury. Although an employee carries the burden of proof on this issue, *see* N.D.C.C. § 65–05–08(6), we agree with Brockel that WSI's decision denying further disability benefits is flawed in several respects.

[¶ 19] First, the gist of the ALJ's reasoning is that Brockel's wage loss is the result of his noncompensable vertebral artery occlusion condition rather than his compensable left shoulder injury because the vertebral artery occlusion makes it impractical for Brockel to either return to work or to undergo the surgery necessary to return him to employment. The ALJ's reasoning ignores this Court's repeated admonitions that an employer takes the employee as it finds him. *See, e.g., Huwe,* 2008 ND 47, ¶ 23, 746 N.W.2d 158; *Svedberg v. North Dakota Workers Comp. Bureau,* 1999 ND 181, ¶ 14, 599 N.W.2d 323; *Nelson v. North Dakota Workmen's Comp. Bureau,* 316 N.W.2d 790, 795 (N.D.1982). Courts have overwhelmingly held that when treatment for a work-related injury is prolonged due to nonwork-related medical conditions, the claimant is entitled to continued disability benefits during the entire period because the existence of the nonwork-related condition does not change the fact that the work-related injury rendered the claimant unable to work. *See, e.g., Thurston v. Guys With Tools, Ltd.,* 217 P.3d 824, 828–29 (Alaska 2009); *Moore v. Component Assembly Sys.,* 158 Md.App. 388, 857 A.2d 549, 554–57 (2004); *Schock v. Morristown Mem'l Hosp./Atlantic Health Sys.,* 2010 WL 2793949 *6 (N.J.Super.A.D. July 2, 2010); *Thomas v. Burggraf Restoration,* 31 P.3d 402, 405 (Okla.Ct.Civ.App. 2001); *Workmen's Comp. Appeal Bd. v. Chamberlain Mfg. Corp.,* 18 Pa.Cmwlth. 572, 336 A.2d 659, 662 (1975); *Orr v. Elastomeric Prods.,* 323 S.C. 342, 474 S.E.2d 448, 449 (Ct.App.1996); *Wood v. Fletcher Allen Health Care,* 169 Vt. 419, 739 A.2d

1201, 1205–06 (1999). As the *Thurston* court explained:

A hypothetical loosely based on the facts of this case illustrates this point. An employee suffers an on-the-job knee injury, leaving her temporarily totally disabled. The employee is initially treated conservatively, but after a number of months all doctors involved in her care agree that surgery is necessary. Before the employee can undergo the needed surgery, she is diagnosed with cancer and immediately begins chemotherapy, foreclosing the possibility of knee surgery for at least a year. The cancer itself does not change the character or extent of the work-related disability; the work-related disability remains temporarily but totally disabling. But the subsequent cancer diagnosis would impede necessary medical treatment of her work-related condition and could not reasonably be excluded from consideration of the duration of her disability. The employer is not liable for the subsequent condition itself, but it remains liable for the work-related injury and disability, even though the subsequent illness may prolong the duration of the employee's disability.... [T]o deny coverage to an employee in such circumstances would "create a windfall to employers simply because of the employee's misfortune in developing an independent medical condition."

217 P.3d at 828–29 (footnote omitted).

[¶ 20] WSI attempts to distinguish *Chamberlain Mfg. Corp.,* 336 A.2d at 662, because under Pennsylvania law the employer bore the burden of proof, but this argument misses the point. These cases did not turn on who bore the burden of proof, but on the legal principle that a nonwork-related condition is not a superseding, intervening event that breaks the causal connection between a work-re-

lated injury and a claimant's disability. *See, e.g., Moore,* 857 A.2d at 556; *Wood,* 739 A.2d at 1206. While *Moore,* at 553, recognized that an unreasonable refusal to undergo treatment will break the chain of causation, WSI concedes in this case that Brockel has not unreasonably refused to undergo surgery for his left shoulder injury for purposes of N.D.C.C. § 65–05–28(4) (employee who "refuses to reasonably participate in medical or other treatments" suspends employee's right to claim compensation). *See also* J. Draper, Annot., *What amounts to failure or refusal to submit to medical treatment sufficient to bar recovery of workers' compensation,* 3 A.L.R.5th 907 (1992).

[¶ 21] WSI also attempts to distinguish *Thurston,* 217 P.3d at 828–29, because the Alaska court emphasized that the claimant had the burden of proving her work-related injury was disabling, regardless of the cancer, and the Workers' Compensation Board was not required to ignore the claimant's cancer. However, in this case the ALJ not only considered Brockel's right vertebral artery occlusion, but made this nonwork-related condition the focus of its analysis without regard to Brockel's compensable left shoulder injury. We have long recognized that a claimant "need not prove that the work-related injury is the sole cause of her disability or even that it is a primary cause of that disability. To the contrary, the work injury need only be a 'substantial contributing factor' to the disability." *Holtz v. North Dakota Workers Comp. Bureau,* 479 N.W.2d 469, 471 (N.D.1992) (quoting *Satrom v. North Dakota Workmen's Comp. Bureau,* 328 N.W.2d 824, 831 (N.D.1982)). Clearly, " 'it is work-related injury that is at the center of the legislature's attention,' " *Bjerke v. North Dakota Workers Comp. Bureau,* 1999 ND 180, ¶ 21, 599 N.W.2d 329 (quoting *Holtz,* at 471), rather than nonwork-related medical conditions.

[¶ 22] Second, the ALJ's conclusion that Brockel's right vertebral artery occlusion had become the cause of his wage loss is especially troubling under the peculiar circumstances of this case. WSI had been paying Brockel disability benefits since the accident. The record does not reflect that a doctor has released Brockel to return to his former line of work, and the ALJ recognized that "Brockel requires activity restrictions with respect to his left arm, but he is not unable to work." The ALJ noted that Dr. Gelfman said Brockel could participate in an FCA, yet it does not appear that an FCA was conducted. Although N.D.C.C. § 65–05.1–01(8) provides that vocational rehabilitative services may be initiated by WSI, the employee, or the employer, the March 12, 2012, "notice of intention to discontinue/reduce benefits" seemed to foreclose an FCA in Brockel's case by simply stating "[d]ue to your right vertebral artery occlusion condition, you are unable to participate in Vocational Rehabilitation services, nor are you released to return to work." The "essence" of the concept of disability under workers compensation law is the "proper balancing of the medical and the wage-loss factors." 4 *Larson's Workers' Compensation Law* § 80.02 (2013). The ALJ's decision ignores WSI's obligation to consider vocational evidence under N.D.C.C. ch. 65–05.1. *See, e.g.,* N.D.C.C. §§ 65–05.1–02 and 65–05.1–02.1; *Rodenbiker v. Workforce Safety and Insurance,* 2007 ND 169, ¶¶ 17–27, 740 N.W.2d 831; *Svedberg,* 1999 ND 181, ¶¶ 14–19, 599 N.W.2d 323. We do not suggest that WSI is required to pay Brockel disability benefits forever based on his vertebral artery occlusion. Rather, any further proceedings on Brockel's disability status, such as an FCA or other vocational testing, must take into

consideration both Brockel's work-related injury and his vertebral artery occlusion.

[¶ 23] We conclude WSI's finding that Brockel failed to show his wage loss was the result of his compensable injury is not in accordance with the law.

### III

[¶ 24] It is unnecessary to address other arguments raised because they either are unnecessary to the decision or are without merit. WSI's decision denying Brockel medical benefits is affirmed. WSI's decision terminating Brockel's disability benefits is reversed. Because WSI failed to provide proper notice under N.D.C.C. § 65–05–08.1(5), Brockel is entitled to retroactive reinstatement of his disability benefits. *See Flink*, 1998 ND 11, ¶ 19, 574 N.W.2d 784. We grant Brockel's request for remand to the district court for consideration of his claim for an award of attorney fees under N.D.C.C. § 28–32–50. We affirm the judgment and order in part, reverse in part, and remand for reinstatement of Brockel's disability benefits and for further proceedings.

[¶ 25] GERALD W. VANDE WALLE, C.J., MARY MUEHLEN MARING, S.J., and DANIEL J. CROTHERS, J., concur.

[¶ 26] The Honorable LISA FAIR McEVERS was not a member of the Court when this case was heard and did not participate in this decision. Surrogate Judge MARY MUEHLEN MARING, sitting.

SANDSTROM, Justice, dissenting.

[¶ 27] I respectfully dissent.

[¶ 28] The majority impermissibly substitutes its judgment for that of the agency. Although the majority correctly states the law, that "[i]n reviewing the agency's findings of fact, we do not make independent findings or substitute our judgment for the agency's judgment," I believe the

majority has done exactly that where it reverses and remands.

### I

[¶ 29] Both sides appear to compete to out-jargon each other. In plain English, on September 27, 2010, Brockel was in a work-related motor vehicle accident. WSI accepted the claim for two broken ribs, two fractures of his shoulder blade, and neck sprain/strain. At that time Brockel did not complain or show symptoms of the neck condition that is the primary focus of this case—"vertebral artery occlusion"—a condition in which an artery is pinched when the neck is turned in a certain way, resulting in restricted blood flow and causing light-headedness. About six months after the accident, on February 17, 2011, Brockel apparently first experienced this condition. He had preexisting degeneration in his spine that could have resulted in this "new condition." This new condition could also have been caused by a trauma, such as the accident, but doctors testified that if the accident had caused the condition, it should have shown up sooner than it did. Not everyone agrees, of course.

[¶ 30] A claimant has the burden of establishing entitlement to benefits. N.D.C.C. § 65–01–11. The majority notes "that an employer takes the employee as it finds him." But that does not make the employer responsible for every condition an employee develops, unless the work is a substantial contributing factor.

[¶ 31] On March 12, 2012, WSI issued a notice denying coverage for the "new condition" and a notice of intention to discontinue or reduce the benefits it had been paying. The notice of hearing specified the issue: "Whether Mr. Brockel's right vertebral artery occlusion [the new condition] at C5–C6 is a compensable injury;

and whether Mr. Brockel is entitled to disability benefits after April 2, 2012."

[¶ 32] After hearing conflicting evidence, the ALJ issued her order, essentially finding the "new condition" was, in fact, a new condition and Brockel had to show it was work-related and he had not done so. The majority affirms here.

## II

[¶ 33] In addition, Brockel accuses WSI of doing something that I believe, on the basis of the record, WSI did not do.

[¶ 34] Brockel claims the following:

The ALJ also denied benefits on the ground Brockel had not provided a new medical verification of disability under N.D.C.C. § 65–05–08.1, though WSI's notice did not seek medical verification, and the issue was not even argued at hearing. (App. 29–30, conclusion of law 2).

[¶ 35] The majority accepts Brockel's construction of what happened—that the claim was decided on the basis of his lacking "a new medical verification," which was not an issue listed by WSI. But the conclusion of law on which Brockel relies says nothing about a "new medical verification":

2. An injured employee's doctor shall certify the period of disability and the extent of the injured worker's abilities and restrictions. N.D.C.C. § 65–05–08.1. The only evidence in the record regarding Mr. Brockel's disability is that he has work restrictions related to his left arm. There is no certification from any doctor removing Mr. Brockel from work. In fact, Dr. Nelson says that Mr. Brockel has no permanent orthopedic disability or impairment from the work injury. Mr. Brockel does require work restrictions, but there is no evidence that a doctor has certified that Mr. Brockel is unable to work because of his

work injury. Accordingly, Mr. Brockel has failed to establish the requirements for verifying disability.

[¶ 36] WSI and the ALJ said nothing about "a new medical verification." The majority apparently believes WSI is being very clever in not saying its findings were made on the basis that Brockel claims:

The "notice of intention to discontinue/reduce benefits" did not mention verification of disability. WSI's April 9, 2012, order discontinuing disability benefits referenced N.D.C.C. § 65–05–08.1 and stated "[a]n injured employee's doctor shall certify the period of disability and the extent of the injured worker's abilities and restrictions." *However, the order did not indicate Brockel failed to comply with the statute's provisions, but merely stated as the reason for terminating benefits that "[c]laimant has not proven that his September 27, 2010, work injury is his primary disabling factor at this time."*

Majority opinion, at ¶ 16 (emphasis added).

[¶ 37] WSI points out the law requires the claimant to establish what WSI gave notice of, and it made its finding on that basis.

## III

[¶ 38] Next the majority moves on to the shoulder injury and outside the central issues of Brockel's appeal. Reading the majority opinion, one would likely conclude Brockel (1) has a shoulder injury (2) that precludes him from working; (3) surgery on his shoulder would permit him to return to work; (4) but the "new condition"—the "vertebral artery occlusion"—precludes this *necessary* surgery on his shoulder. Except for (1), each of the points is contrary to the findings of fact which are supported by the record.

[¶ 39] The ALJ said:

The only evidence in the record regarding Mr. Brockel's disability is that he has work restrictions related to his left arm. There is no certification from any doctor removing Mr. Brockel from work. In fact, Dr. Nelson says that Mr. Brockel has no permanent orthopedic disability or impairment from the work injury. Mr. Brockel does require work restrictions, but there is no evidence that a doctor has certified that Mr. Brockel is unable to work because of his work injury.

Further:

The evidence shows that Mr. Brockel requires activity restrictions with respect to his left arm, but he is not unable to work. Mr. Brockel does have non-work-related vertebral artery occlusion, which according to Dr. Larkins, makes it dangerous to work, and according to Dr. Gelfman, requires work that does not require Mr. Brockel to look over his right shoulder.

The ALJ found:

On May 16, 2011, Dr. Rock advised that surgery on Mr. Brockel's neck would be too risky to the vertebral artery, therefore no surgical intervention was recommended. Nor did Dr. Rock recommend surgery for Mr. Brockel's shoulder. "At the moment, the shoulder is not causing him that much discomfort to warrant surgery, which would be accompanied by significant added risk given his positioning on the table, let alone intubation."

Further:

The greater weight of the evidence shows that Mr. Brockel's work injuries have not rendered him completely disabled. Mr. Brockel has not worked since his work injury, yet he was released to do one-handed work, and Dr. Gelfman imposed work restrictions on June 10, 2011, but no doctor removed him from work. More recently, Dr. Nelson has advised that Mr. Brockel requires no work restrictions other than those for his left arm.

[¶ 40] The majority's logic at ¶ 19 is also flawed:

First, the gist of the ALJ's reasoning is that Brockel's wage loss is the result of his noncompensable vertebral artery occlusion condition rather than his compensable left shoulder injury because the vertebral artery occlusion makes it impractical for Brockel to either return to work or to undergo the surgery necessary to return him to employment. The *ALJ's reasoning ignores this Court's repeated admonitions that an employer takes the employee as it finds him.*

(Emphasis added.) But if, for example, WSI accepts responsibility for an on-the-job foot injury, that does not mean the employer and WSI are responsible for cancer the individual develops if it is unrelated to the job. The majority cites to *Thurston v. Guys With Tools, Ltd.*, 217 P.3d 824, 828–29 (Alaska 2009), in which the employee's pre-existing cancer and its treatment increased the time it took to recover from the work-related injury. But that is fundamentally different from saying the employer/WSI is responsible for disability from the cancer after recovery from the work-related injury.

[¶ 41] Further, the "new condition" was not a pre-existing condition as in the cases cited by the majority, but a subsequent condition.

[¶ 42] The findings of fact supported by the record reflect that Brockel's shoulder injury does not preclude him from working and that the "new condition" does not preclude shoulder surgery necessary for Brockel to work.

## IV

[¶ 43]   The findings were made that the "new condition" was, in fact, a new condition and that it was not compensable. Brockel was not denied due process, and although his non-work related "new condition" makes surgery inadvisable, surgery on his shoulder is not necessary for him to return to work.   I would affirm on the basis of a proper application of the standard of review.

[¶ 44]   Dale V. Sandstrom